UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK PARSONS, BRANDON BRADLEY,
SCOTT GANDY, ROBERT HELLIN,
JOSEPH BRUCE, and JOSEPH UTSLER,

Case No.

    Plaintiffs,

Hon.

vs.

**COMPLAINT**

UNITED STATES DEPARTMENT OF JUSTICE
and FEDERAL BUREAU OF INVESTIGATION,

    Defendants.

_____/

SAURA J. SAHU (P69627)
MILLER, CANFIELD, PADDOCK
  AND STONE, P.L.C.
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420
sahu@millercanfield.com

MICHAEL J. STEINBERG (P43085)
DANIEL S. KOROBKIN (P72842)
KARY L. MOSS (P49759)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org
dkorobkin@aclumich.org

Attorneys for Plaintiffs
Parsons, Bradley, Gandy and Hellin

HOWARD HERTZ (P26653)
ELIZABETH C. THOMSON (P53579)
Hertz Schram, P.C.
1760 South Telegraph Road
Bloomfield Hills, Michigan 48302
(248) 335-5000
hhertz@hertzschram.com

FARRIS F. HADDAD (P71538)
FARRIS F. HADDAD & ASSOCIATES, P.C.
26100 American Drive, Suite 605
Southfield, Michigan 48034
(888) 818-1646
Farris@CallFarris.com

Attorneys for Plaintiffs Bruce and Utsler

_____/

**COMPLAINT**

     Plaintiffs Mark Parsons, Brandon Bradley, Scott Gandy, Robert Hellin, Joseph Bruce

and Joseph Utsler state as follows for their Complaint against Defendants United States

Department of Justice and the Federal Bureau of Investigation:

**PRELIMINARY STATEMENT**

1.     Plaintiffs challenge the federal government's unwarranted and unlawful decision to designate a musical band's supporters as a criminal gang, thereby subjecting them to significant harm, including repeated police harassment and denial of employment.

2.     Among the supporters of almost any group – whether it be a band, sports team, university, political organization or religion – there will be some people who violate the law. Inevitably, some will do so while sporting the group's logos or symbols.  However, it is wrong to designate the entire group of supporters as a criminal gang based on the acts of a few.  Unfortunately, that is exactly what happened here.

3.     Plaintiffs self-identify as "Juggalos," or fans of the musical group Insane Clown Posse ("ICP") and other bands on ICP's independent record label, Psychopathic Records. Some of ICP's songs, such as "Juggalo Homies," "Juggalo Island," and "Miracles," have hopeful, life-affirming themes about the wonders of life and the support that Juggalos give to one another. Other music, called "horrorcore hip hop," uses very harsh language to tell nightmare-like stories with an underlying message that horrible things happen to people who choose evil over good.

4.     Many people view Juggalos as nonconformists because of their musical tastes, their practice of painting their faces to look like clowns, and the distinctive Juggalo symbols – including the "hatchetman" logo – that they often display on their clothing, jewelry, body art and bumper stickers.  Yet when Juggalos come together at concerts or their annual week-long gathering every summer, they know that they are in a community where all people are equal and where they will be accepted and respected for who they are. The unifying theme for Juggalos is that no matter what one's economic status, racial

background or past problems, Juggalos are a "family" of people who love and help one another, enjoy one another's company, and bond over the music and a philosophy of life. Organized crime is by no means part of the Juggalo culture.

5.     The Defendants, the United States Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI"), estimate that there are over a million Juggalos in the United States. As with any large group, a relative handful engage in criminal activity, sometimes while wearing Juggalo symbols.  Yet, in 2011, Defendants seized on reports of independent crimes to brand Juggalos across the country as a "loosely-organized hybrid gang" in the DOJ's 2011 National Gang Threat Assessment ("2011 Assessment").

6.     This gang designation has caused real harm to ordinary Juggalos from coast to coast.  Defendants widely published the designation to state and local police agencies through an online law enforcement database, as well as through reports and other means. As a result, state and local police routinely stop, detain, interrogate, photograph and document people like Plaintiffs, who do not have any connections to gangs, because they have exercised their First Amendment rights to express their identity as Juggalos by displaying Juggalo symbols.  Other Juggalos, including plaintiff Scott Gandy, have been denied consideration for employment because of the gang designation.  The designation has a chilling effect on Juggalos' ability to express themselves and to associate with one another.

7.     Defendants' designation of the Juggalos as a "hybrid gang" violates the federal Administrative Procedure Act (APA) for three reasons.  First, it infringes on Juggalos' First Amendment freedoms and is unconstitutionally vague in violation of Due Process. Second, branding the group as a gang is arbitrary and capricious, since the DOJ

stigmatized an entire fan base of more than a million people even though it knows that only a small fraction of individuals have engaged in isolated criminal acts. Third, Defendants violated criminal intelligence collection procedures by gathering information on Juggalos without reasonable suspicion to believe that the group is involved in a "definable criminal activity or enterprise" and by gathering such information in a way that interferes with their protected activities.

8.      As set forth below, Plaintiffs seek a declaration that designating the Juggalos as a gang or "hybrid gang" is unlawful.  They also seek an order under the APA removing the Juggalos from the DOJ's gang list and enjoining Defendants from taking action in the future that would brand Juggalos, as a group, as a criminal gang based on the actions of a relatively few people who may identify as Juggalos.

## JURISDICTION

9.      The Court has federal question jurisdiction under 28 U.S.C. § 1331 because this case arises under the United States Constitution and the federal Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq*.

## VENUE

10.     The Eastern District of Michigan is the proper venue for this case under 28 U.S.C. § 1391(e) because Plaintiffs Joseph Utsler and Joseph Bruce reside in this District, and the DOJ and the FBI are agencies of the United States government.

## PARTIES

11.     Plaintiff Mark Parsons is a Juggalo. He resides in Las Vegas, Nevada.

12.     Plaintiff Brandon Bradley is a Juggalo. He resides in Citrus Heights, California.

13.     Plaintiff Scott Gandy is a Juggalo. He resides in Concord, North Carolina.

14.     Plaintiff Robert Hellin is a Juggalo. He resides in Garner, Iowa.

15.     Plaintiff Joseph Utsler is a Juggalo and a member of the musical group ICP. He resides in Davisburg, Michigan.

16.     Plaintiff Joseph Bruce is a Juggalo and a member of ICP. He resides in Farmington Hills, Michigan.

17.     Defendant DOJ is a department of the United States government.

18.     Defendant FBI is an agency within the DOJ.

19.     The DOJ and the FBI are each "agencies" within the meaning of the APA.

20.     The FBI is responsible for administering the National Gang Intelligence Center ("Center" or "NGIC"). The Center is a multi-agency operation of the United States government that is responsible for collecting, analyzing and disseminating information from and to federal, state and local prosecutors, law enforcement authorities and corrections officials about criminal street gangs, prison gangs and outlaw motorcycle gangs.

## GENERAL ALLEGATIONS

### ICP and the Juggalos

21.     ICP is a musical group formed in or about 1991 and based in Farmington Hills, Michigan. The group is known for its elaborate live performances. It has two certified platinum albums – that is, selling one million (1,000,000) or more copies in the U.S. – and five gold albums – that is, selling five hundred thousand (500,000) or more copies in the U.S. – to its credit. ICP can be controversial, rebellious and provocative. But the duo is an artistic venture and a musical group like other popular entertainers – whether they be

club-music artists, gangster rappers, death metal bands, folk singers or more traditional artists.

22.     Some ICP songs deal with social, political or religious themes; others are counter-cultural; and others are simply artistic entertainment and expression. The songs often use harsh language and themes.

23.     Juggalos are members of ICP's dedicated musical fan base. These music fans have been known as "Juggalos" since the early 1990s. They appreciate ICP's music and its other expressive art.

24.     As an expression of their identity, Juggalos often obtain and display distinctive tattoos of ICP and Psychopathic Record art and icons. They also wear and otherwise display ICP art, symbols and insignia on their clothing and other personal belongings.

25.     Juggalos gather and associate with each other to listen to ICP's music, to share ideas surrounding the music, to express their support of or interest in the ideas that ICP expresses through its music, to express their affiliation with ICP and the artists on its record label, and to express their affiliation with one another.

26.     The expressive activities and purposes described above are primary reasons why Juggalos group together and associate with one another.

27.     The primary purposes of the Juggalos – as a group – do not include engaging in criminal activity.

28.     Many Juggalos embrace "Juggaloism" as a philosophy, an identity, and a way of life. ICP's lyrics, through their description of a "Dark Carnival," address themes of good and evil, heaven and hell, and acceptance and tolerance of others. Juggalos follow these

ethics and try to live by the moral code of the "Carnival." Many Juggalos also see themselves as social outcasts and look to one another for acceptance and support. Based on these shared values, Juggalos strongly identify with one another and often refer to themselves as a "family."

**Plaintiff Mark Parsons**

29.    At all relevant times, Parsons was a Juggalo.

30.    Parsons has never knowingly affiliated with any criminal gang.

31.    Parsons owns and operates a small trucking business entitled "Juggalo Express LLC," a limited liability corporation incorporated in the State of Utah.

32.    Parsons drives a semi truck for Juggalo Express LLC.

33.    Parsons decorates the side of his semi truck with a large, visible ICP "hatchetman" logo. Parsons placed this logo on his truck to express his affinity for ICP's music, his identity as a Juggalo, and his affiliation with the Juggalo community.

34.    On or about July 9, 2013, Parsons was riding with a driver-trainee in Parsons's semi truck on an interstate freeway outside Knoxville, Tennessee. The trainee was properly driving and Parsons was instructing when they entered a weigh station operated by the Tennessee Department of Transportation.

35.    In accordance with posted instructions, they drove in the "bypass" lane so that Parsons's truck could be weighed while continuing to move at a slow speed.

36.    As they drove in the bypass lane, a Tennessee State Trooper ordered Parsons and the trainee to stop the truck and park for a safety inspection. They complied.

37.    Once they parked, the State Trooper approached Parsons and asked if he was a Juggalo.

38.    The State Trooper indicated that he detained Parsons for an inspection because of the hatchetman logo on the truck.

39.    The State Trooper indicated that he considered Juggalos to be a criminal gang because of the DOJ's designation.

40.    The State Trooper asked Parsons if he had any axes, hatchets, or other similar chopping instruments in the truck. Parsons truthfully answered that he did not.

41.    The State Trooper continued to search the truck and interrogate Parsons for about an hour, delaying Parsons' time-sensitive hauling work. During the search, the State Trooper did not find any weapons or contraband. The State Trooper did not issue a ticket or other citation to Parsons.

42.    During the detention, the State Trooper never:

a.    identified a motor vehicle safety offense that might support a safety inspection;

b.    informed Parsons about any motor vehicle safety offense that might otherwise support the detention; or

c.    articulated any reasonable suspicion to believe that criminal activity might be afoot, aside from the State Trooper's perception of the hatchetman logo.

43.    Parsons never consented to the detention for the purpose of questioning his Juggalo affiliation.

44.    Parsons did not feel free to terminate the detention before the State Trooper released Parsons.

**Plaintiff Brandon Bradley**

45.    At all relevant times, Bradley was a Juggalo.

46.    Bradley has never knowingly affiliated with any criminal gang.

-8-

47.    In or around September 2012, a Citrus Heights, California Police Officer in a patrol car flashed the car's lights and stopped Bradley when Bradley was biking home.

48.    At the time, Bradley had visible Juggalo tattoos and was wearing a Twiztid Batman shirt, which is Juggalo merchandise.

49.    At all relevant times, Bradley obtained and displayed his Juggalo tattoos in order to express his affinity for the music of Psychopathic Records artists, his affiliation with the Juggalos as music fans, and his pride in being a member of the Juggalo community.

50.    At all relevant times, Bradley possessed and displayed his merchandise from ICP and other Psychopathic Records artists in order to express his affinity for the music, his affiliation with the Juggalos as music fans, and his pride in being a member of the Juggalo community.

51.    Upon information and belief, the actual and primary reason that the officer stopped Bradley was because the officer saw Bradley's Juggalo tattoos and merchandise.

52.    The officer detained Bradley for about fifteen minutes while interrogating Bradley about being a Juggalo and about his Juggalo tattoos.

53.    The officer took notes about Bradley's answers.

54.    Later, an ex-Citrus Heights Police Officer told Bradley that the ex-officer heard about the above encounter and that Bradley would have to get his Juggalo tattoos removed if he wanted to be a police officer because the tattoos are gang-affiliated.

55.    In or around October 2012, Bradley was walking across a street in downtown Sacramento, California.

56.    At the time, he was wearing a shirt bearing an ICP-related insignia, and some of his ICP-related tattoos were visible.

57.     As he crossed the street, a uniformed deputy from the Sacramento Sheriff's Department approached Bradley.

58.     The deputy asked if Bradley was a Juggalo.

59.     The deputy demanded to see Bradley's identification, and Bradley complied.

60.     The deputy took Bradley's identification and his ICP-themed wallet and held them throughout the encounter.

61.     Bradley did not feel free to demand his wallet and identification back or to leave without them.

62.     The deputy ran a background check on Bradley.

63.     The deputy detained and questioned Bradley for a substantial amount of time, during which the deputy accused Bradley of being in a gang because he was a Juggalo. The deputy stated that to be a Juggalo is to be a gang member. The deputy also asked Bradley about his ICP-related tattoos.

64.     One evening in January 2013, Bradley was walking alone in the bike lane on a stretch of road that did not have a sidewalk.

65.     Bradley was wearing an ICP jacket with a large red "hatchetman" insignia on the back.

66.     A black, unmarked police cruiser passed Bradley in the opposite direction.

67.     The cruiser performed a U-turn, pulled up behind Bradley and stopped him.

68.     Two male officers wearing bullet-proof vests – who appeared to be gang-squad officers – exited the cruiser and immediately told Bradley that they noticed his jacket with the "hatchetman" insignia.

69.     The officers ordered Bradley to stand in front of a guardrail with his back to them so that they could take pictures of his jacket.

70.     Bradley submitted while the officers also took photographs of his face and his tattoos.

71.     For a lengthy time period, the officers interrogated Bradley about his status as a Juggalo and about whether he was a gang member. The officers took notes about the encounter and about Bradley's responses. Although Bradley denied being in any gang, the officers translated his answers into gang-related terms when they repeated them.

72.     Upon information and belief, the officers entered this information into a gang information database that is part of or feeds information into the gang information database that the NGIC administers.

73.     Bradley did not feel free to end the encounter until the officers released him.

74.     Upon information and belief, each of the law enforcement officials above relied upon the DOJ's classification of the Juggalos as a gang when deciding whether to stop, question or otherwise detain or investigate Bradley.

75.     Due to the incidents above, Bradley has decided on numerous occasions not to wear Juggalo-related clothing or other merchandise, not to publicly express his affinity for ICP music, and not to express his membership in the Juggalo community. He has taken these steps in order to avoid similar negative contacts with law enforcement in the future.

**Plaintiff Scott Gandy**

76.     At all relevant times, Gandy was a Juggalo.

77.     Gandy has never knowingly affiliated with any criminal gang.

-11-

78.     In or around 2012, Gandy visited an Army recruiting office where he had become familiar with the recruiters.

79.     Gandy had large ICP-related tattoos on his chest, which he obtained to express his affinity for ICP's music, his status as a Juggalo and his appreciation of other Psychopathic Records artists' music.

80.     At the recruiting office, the Army's recruiting Sergeant asked Gandy if he had any tattoos. Gandy showed the Sergeant his Juggalo tattoos.

81.     The Sergeant told Gandy that the Juggalos were on the federal government's gang list. The Sergeant said that he considered Gandy's Juggalo tattoos to be gang-related. Upon information and belief, the Sergeant's determination that the Juggalos were a prohibited criminal gang was based on the DOJ's Juggalo gang designation.

82.     The Sergeant questioned Gandy about whether he was a gang member.

83.     The Sergeant instructed Gandy that he must remove or permanently cover his Juggalo tattoos or the Army would immediately deny his recruitment application. The Sergeant said that it did not matter how virtuous a life Gandy had lived, the Army could not and would not accept him with the tattoos. The Sergeant said that to be considered by the Army, Gandy must remove or permanently cover the tattoos.

84.     Upon information and belief, the Army has a policy prohibiting "gang" tattoos.

85.     Although the Army has not publicly released the materials it uses to identify criminal "gangs" and their members, upon information and belief, the Army deems the Juggalos to be a criminal gang and bases that assessment on the DOJ's Juggalo gang designation.

86.     As a result of the Sergeant's instructions and comments, Gandy spent hundreds of dollars to undergo a painful procedure in which his Juggalo tattoos were covered with other tattoos. Gandy underwent this procedure in order to receive consideration of his recruitment application. Gandy would not have undergone this procedure or obtained these new tattoos if the Sergeant had not indicated that it was necessary.

87.     After undergoing the procedure, Gandy returned to the recruitment office and again showed the same Sergeant his new tattoos.

88.     The Sergeant said that he approved and that Gandy's application would receive consideration. Ultimately, Gandy's application was denied.

**Plaintiff Robert Hellin**

89.     At all relevant times, Hellin was a Juggalo.

90.     Hellin has never knowingly affiliated with any criminal gang.

91.     Hellin enlisted in the Army in 2008, before the Juggalo gang designation. He is a Corporal in the Army, where he has served honorably in Iraq, Afghanistan and Korea as a member of cavalry and special operations units.

92.     Hellin has visible ICP-related tattoos, which he obtained and displays in order to express his identity as a Juggalo.

93.     Upon information and belief, because of the Juggalo gang designation, Hellin's identity as a Juggalo places him in imminent danger of suffering discipline or an involuntary discharge from the Army.

**Plaintiffs Joseph Bruce and Joseph Utsler**

94.     At all relevant times, Bruce and Utsler were Juggalos and members of the musical group ICP.

95.     Bruce and Utsler do not knowingly affiliate with any criminal gang.

96.     On August 20, 2012, ICP entered into a contract with AEG Live to perform at the Royal Oak Music Theater in Royal Oak, Michigan on October 31, 2012 for ICP's annual musical and artistic event known as "Hallowicked," with a possible second performance on October 30, 2012 if tickets to the October 31 performance sold out.

97.     On or about October 8, 2012, the Royal Oak Music Theater cancelled the Hallowicked event without notice, initially indicating that it was the landlord's decision.

98.     After discussions with AEG Live and Royal Oak Music Theater, ICP's record label discovered that the Royal Oak Police Department asked the Royal Oak Music Theater to cancel the event.

99.     When asking the Royal Oak Music Theater to cancel the Hallowicked event, the Royal Oak Police Department cited the federal Juggalo gang designation.

**The DOJ and the National Gang Intelligence Center**

100.     In Public Law 109-162, 119 Stat. 2960 (2005), Congress directed the Attorney General to "establish a National Gang Intelligence Center and gang information database to be housed at and administered by the [FBI] to collect, analyze, and disseminate gang activity information from" the FBI, the Bureau of Prisons, the Drug Enforcement Administration, other federal agencies, and state and local law enforcement, prosecutors, and correctional officers. In the same federal statute, Congress directed the Center:

> a.     to make that same information available to "Federal, State, and local law enforcement agencies," to "Federal, State, and local corrections

agencies and penal institutions," and to "Federal, State, and local prosecutorial agencies," as well as to "any other entity as appropriate"; and

b.      to "annually submit to Congress a report on gang activity."

101.    The DOJ promptly established the Center in response to Congress's direction, and upon information and belief, the FBI has administered the Center since its inception.

102.    Upon information and belief, the DOJ and/or the FBI promptly established a gang information database in response to Congress's direction.

103.    In an April 2008 report to Congress, the Attorney General described the Center as part of a coordinated set of "intelligence and enforcement mechanisms aimed at dismantling the most significant violent national and regional gangs." The Attorney General said:

> NGIC integrates the gang intelligence assets of all Department of Justice agencies and has established partnerships with other federal, state, and local agencies that possess gang-related information--serving as a centralized intelligence resource for gang information and analytical support. *This enables gang investigators and analysts . . . to further identify gangs and gang members . . . and to guide the appropriate officials in coordinating their investigations and prosecutions to disrupt and dismantle gangs.* The NGIC's mission is to support law enforcement agencies through timely and accurate information sharing and strategic/tactical analysis of federal, state, and local law enforcement intelligence focusing on the growth, migration, criminal activity, and association of gangs that pose a significant threat to communities throughout the United States.

U.S. Dep't of Justice, Attorney General's Report to Congress on the Growth of Violent Street Gangs in Suburban Areas (2008) (emphasis added).

104.    Federal statutes do not define the term "gang."

105.    According to the federally-funded "National Gang Center," law enforcement authorities fail to agree on what a "gang" is. The National Gang Center has stated, "There is no widely or universally accepted definition of a 'gang' among law enforcement agencies."

106.    Federal law defines the term "criminal street gang" as a group that has at least five members; "has as one of its *primary purposes* the commission of 1 or more [specified federal felony-level] criminal offenses" involving drugs, violence, or a conspiracy to commit the same; has a membership that engaged in a continuing series of those crimes within the past five years; and engages in activities that affect interstate commerce. 18 U.S.C. § 521(a) (emphasis added).

**NGIC Online**

107.    Through the Center, the DOJ and FBI publish a variety of official reports and other official materials.

108.    Many of those reports and materials are made available to the general public on the Internet at http://www.nationalgangcenter.gov, which is funded by the DOJ. The DOJ and FBI, in turn, cite and rely upon the materials, resources and statistics that are published at http://www.nationalgangcenter.gov.

109.    The Center created a separate online database, NGIC Online, to publish and otherwise make available its reports, findings and other information to federal, state and local prosecutors, law enforcement officials and corrections officials. The Center continues to administer and use NGIC Online for that purpose.

110.    At all relevant times, the DOJ has controlled the content of what is published and/or distributed on NGIC Online.

111.    Upon information and belief, NGIC Online includes the reports and materials that are published at http://www.nationalgangcenter.gov.

112.    Upon information and belief, the DOJ has incorporated NGIC Online into the Law Enforcement Online database. According to the FBI, the Law Enforcement Online

database "is a secure, Internet-based information sharing system for agencies around the world that are involved in law enforcement, first response, criminal justice, anti-terrorism, and intelligence. With LEO, members can access or share sensitive but unclassified information anytime and anywhere. * * * By using one name and password, agencies can access LEO and such resources as . . . [the] National Gang Intelligence Center . . . ."

113.   The DOJ and FBI intend for federal, state and local prosecutors, law enforcement officials and corrections officials to use the information that is available on NGIC Online when they engage in governmental actions against members or affiliates of any gang that the DOJ and/or the FBI identifies.

114.   The number of queries by state and local law enforcement officials to NGIC Online apparently exceeds 200,000 per year.

115.   Upon information and belief, since at least 2010, federal, state and local prosecutors, law enforcement officials and corrections officials have been actively using and relying on NGIC Online when engaging in governmental actions against members or affiliates of the groups that the DOJ and/or the FBI have identified as gangs.

**2009 National Gang Threat Assessment**

116.   In 2009, the Center published its 2009 National Gang Threat Assessment, in which the Center summarized and reported about the information it had collected and analyzed to that point in relation to street gangs, prison gangs, and outlaw motorcycle gangs.

117.   From in or around 2009 until the filing of this Complaint, the 2009 Assessment was available to the general public at http://www.nationalgangcenter.gov.

Upon information and belief, the 2009 Assessment has also been available on NGIC Online throughout roughly the same time period.

118.    The 2009 Assessment does not mention the Juggalos or identify them as any kind of "gang." Instead, it focuses on known prison gangs, outlaw motorcycle gangs, and criminal street gangs such as the Mexican Mafia, Bloods, Crips, Hells Angels, Mara Salvatrucha 13, Vice Lords, and Gangster Disciples, each of which is purportedly linked to interstate drug trafficking or distribution, and some of which are purportedly also linked to interstate human and weapons trafficking.

**2011 National Gang Threat Assessment**

119.    In or about October 2011, the Center published the 2011 Assessment, which was its third National Gang Threat Assessment.

120.    According to the Center, the 2011 Assessment "enhances and builds on the gang-related trends and criminal threats identified in the 2009 assessment."

121.    According to the Center, the 2011 Assessment "supports US Department of Justice strategic objectives 2.2 (to reduce the threat, incidence, and prevalence of violent crime) and 2.4 (to reduce the threat, trafficking, use, and related violence of illegal drugs)."

122.    According to the Center, the 2011 Assessment "is based on federal, state, local, and tribal law enforcement and corrections agency intelligence, including information and data provided by the National Drug Intelligence Center (NDIC) and the National Gang Center. Additionally, this assessment is supplemented by information retrieved from open source documents and data collected through April 2011."

123.    From on or about its 2011 publication through the time of the filing of this Complaint, the 2011 Assessment has been available to the general public at

http://www.nationalgangcenter.gov.

124.    Upon information and belief, the 2011 Assessment has also been accessible through NGIC Online since its original publication.

125.    Upon information and belief, the DOJ intended and still intends for federal, state and local prosecutors, law enforcement officials and corrections officials to use the 2011 Assessment when they engage in governmental actions targeting and/or against members or affiliates of any "gang" that the DOJ identifies.

126.    Upon information and belief, federal, state and local prosecutors, law enforcement officials and corrections officials have been actively using or relying on the 2011 Assessment when engaging in governmental actions targeting and/or against members or affiliates of any "gang" that the DOJ identifies, including Juggalos.

**Hybrid Gangs**

127.    The 2011 Assessment contains a section about "hybrid gangs."

128.    Federal statutes do not define the term "hybrid gang."

129.    The 2011 Assessment does not specifically define the term "hybrid gang."

130.    The 2011 Assessment suggests that hybrid gangs are groups composed of people who affiliate with other known criminal street gangs.

131.    The 2011 Assessment states:

    a.    "The expansion of hybrid gangs—non-traditional gangs with multiple affiliations—is a continued phenomenon in many jurisdictions nationwide. Because of their multiple affiliations, ethnicities, migratory nature, and nebulous structure, hybrid gangs are difficult to track, identify, and target as they are transient and continuously evolving."

    b.    Hybrid gangs "are adopting national symbols and gang members often crossover from gang to gang."

  c.  "Hybrid Gangs . . . are fluid in size and structure, yet tend to adopt similar characteristics of larger urban gangs, including their own identifiers, rules, and recruiting methods."

## Juggalos as a "Hybrid Gang"

132. In the 2011 Assessment, the Center designated the "Juggalos" as "a loosely-organized hybrid gang."

133. The nationwide Juggalo membership, believed to be over one million fans, vehemently reject the gang label they have received in recent years.

134. The 2011 Assessment does not define what a "Juggalo" is, but it states: "Juggalos are traditionally fans of the musical group the Insane Clown Posse."

135. In fact, the vast majority of Juggalos are music fans who are not involved in any criminal gang or any gang-related activity. They liken themselves to a family.

136. There is little to no structure within the Juggalos as a group, and there is no formalized leadership.

137. In the 2011 Assessment, the DOJ's Juggalo gang designation identifies Juggalos – simply *as* Juggalos – as being members of a "hybrid gang."

138. The Juggalo gang designation refers to Juggalos as an entire group or association.

139. The Juggalo gang designation does not contain any meaningful distinction between law-abiding Juggalos and individual criminal Juggalos or criminal "subsets" of Juggalos.

140. The 2011 Assessment states:

  a.  "[M]any Juggalo subsets exhibit gang-like behavior and engage in criminal activity and violence."

  b.  "Most crimes committed by Juggalos are sporadic, disorganized,

individualistic, and often involve simple assault, personal drug use and possession, petty theft, and vandalism."

c.   "[A] small number of Juggalos are forming more organized subsets and engaging in more gang-like criminal activity, such as felony assaults, thefts, robberies, and drug sales."

d.   "Juggalos' disorganization and lack of structure within their groups, coupled with their transient nature, makes it difficult to classify them and identify their members and migration patterns."

141.   The DOJ, FBI and the Center use and encourage other governmental agencies to use an individual's Juggalo tattoos to indicate that the individual is a Juggalo.

142.   The DOJ, FBI and the Center use and encourage other governmental agencies to use an individual's act of wearing, possessing or displaying ICP clothing, symbols or other merchandise to indicate that the individual is a Juggalo.

143.   The DOJ, FBI and the Center use and encourage other governmental agencies to use an individual's act of wearing, possessing or displaying the clothing, symbols or other merchandise of other Psychopathic Records artists to indicate that the individual is a Juggalo.

144.   In order to avoid being subject to police scrutiny as a gang member, individual law-abiding Juggalos must:

a.   forsake their status as Juggalos (whether as music fans or as part of the "family" that shares the same philosophy);

b.   refrain from identifying themselves as Juggalos;

c.   refrain from affiliating or associating with other Juggalos;

d.   refrain from affiliating or associating with ICP and other Psychopathic Records artists;

e.   refrain from attending concerts and events of Psychopathic Records artists;

f.   refrain from obtaining or displaying Juggalo tattoos;

g.    remove Juggalo tattoos that they already have; and/or

h.    refrain from buying, possessing, wearing, donning or displaying the clothing, symbols or other merchandise of ICP or other Psychopathic Records artists.

145.    Insofar as federal officials reasonably believe that individual Juggalos affiliate with other known criminal gangs – such as the Bloods or Crips – the DOJ, FBI and the Center can identify, locate and target those individuals' criminal-gang-related activity by focusing either on their relationships with known criminal gangs or on their personal conduct.

146.    In response to a request under the federal Freedom of Information Act for all information upon which the DOJ relied in making its Juggalo gang designation, the DOJ produced 102 pages of the total 156 pages that were purportedly responsive.

147.    The DOJ, FBI and the Center have not provided, and upon information and belief do not have, sufficient evidence to support a reasonable basis for concluding that the Juggalos:

a.    are a nationally affiliated criminal street gang;

b.    affiliate on any significant group-wide basis with known criminal gangs;

c.    have as a primary purpose a shared criminal purpose as a group;

d.    engage in an ongoing scheme of criminal activity;

e.    commit crimes as part of any coherent, overarching criminal-gang plan;

f.    are involved as a group in interstate drug, human or weapons trafficking; or

g.    present a significant threat, as a group, to communities throughout the United States, or to public safety in those communities.

148.    In the 2011 Assessment and the FOIA Production, the DOJ, FBI and the Center have not provided – and upon information and belief they do not have – sufficient evidence of a causal link between the classification of the Juggalos as a hybrid gang and the governmental interests in:

> a.    reducing the threat, trafficking, use, and "related violence" of illegal drugs; and/or
>
> b.    reducing the threat, incidence, and prevalence of violent crime.

149.    As a result of Defendants' classification of the Juggalos as a gang, Plaintiffs and other Juggalos have suffered a variety of harms at the hands of government officials. These harms not only include harms to Plaintiffs' good names, reputations, honor and integrity, but also improper stops, detentions, interrogations, searches, denials of consideration for federal employment, and interference with existing federal employment, as well as other distinct harms. Defendants' classification of the Juggalos as a gang also has a chilling effect on the expressive and associational activity of Plaintiffs and other Juggalos.

## COUNT 1: Administrative Procedure Act
## (Agency Action Contrary to the First Amendment's Freedom of Association)

150.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs of this Complaint.

151.    Plaintiffs assert this claim under the federal Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA") and U.S. Const. amend. I.

152.    The DOJ's Juggalo gang designations are interpretive rules under the APA.

153.    The DOJ and FBI engaged in "final agency action" under § 704 of the APA when the Center issued the 2011 Assessment and its Juggalo gang designations.

154. As Juggalos, Plaintiffs were within the zone of interests regulated by these final agency actions.

155. These final agency actions do not provide any relevant, meaningful way to differentiate between law-abiding Juggalos and individual criminal Juggalos.

156. Under § 702 of the APA, Plaintiffs suffered legal wrongs or were adversely affected or aggrieved because of the Center's classification of the Juggalos as a gang. These wrongs, adverse effects and/or aggrievements not only include harms to Plaintiffs' good names, reputations, honor and integrity, but also improper stops, detentions, interrogations, searches, improper denials of consideration for federal employment, compelled expression (in the form of a forced tattoo), and interference with existing federal employment, as well as other distinct harms.

157. Under § 706(2)(B) of the APA, this Court has authority to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity."

158. The First Amendment protects individuals' right to associate for purposes of engaging in the forms of expression that the Amendment protects.

159. Juggalos associate together for the primary purposes of listening to and appreciating the music of ICP and other Psychopathic Records artists; sharing ideas about that music and expressing their support of or interest in the ideas that ICP expresses through its music; expressing their affiliation with ICP and the artists on its record label; and expressing their affiliation with other Juggalos and their identification with Juggaloism as a philosophy, a set of values, a moral code, and a way of life.

160.    Plaintiffs Parsons, Hellin, Gandy and Bradley associate with other individuals as "Juggalos" in order to engage in protected expression. Plaintiffs' protected expression includes listening to the music of Psychopathic Records artists, attending "gatherings," concerts and other musical events by these artists, expressing Plaintiffs' identity and affiliation as Juggalos, bearing Juggalo tattoos and other Juggalo art, and discussing political and/or moral issues with other Juggalos.

161.    The group known as the "Juggalos" does not have a primary purpose of committing criminal offenses. The vast majority of individual Juggalos do not associate together to commit crimes.

162.    Plaintiffs do not associate with other Juggalos in order to commit crimes.

163.    By classifying the entire group of Juggalos – which is overwhelmingly composed of law-abiding music fans – as some form of criminal gang, the DOJ and FBI have directly burdened Plaintiffs' and other Juggalos' First Amendment freedom of association. That classification burdens the Juggalos, including Plaintiffs, *because* they are Juggalos.

164.    Due to the Center's particular role in serving as a central clearinghouse and authority about criminal street gangs, the DOJ's use of the Center's reports to designate the Juggalos as a gang has actually and proximately caused state and local law enforcement and correctional officers to wrongfully treat Plaintiffs and other Juggalos as if they were criminal street gang members.

165.    The law enforcement and correctional actions discussed above directly burden Plaintiffs' freedom of association.

166.   The federal, state and local actions discussed above chill the freedom of association of substantial numbers of Juggalos who are not members of any criminal street gang.

167.   The DOJ's classification of the Juggalos as a hybrid gang reaches a substantial amount of protected associational conduct and is unconstitutionally overbroad.

168.   The Center's classification of the Juggalos as a hybrid gang is not a narrowly tailored means, the least restrictive alternative, a necessary means, or a directly and palpably connected means to further any sufficient, substantial or compelling governmental interest.

WHEREFORE, Plaintiffs request that this Court enter an order under the APA holding unlawful and setting aside the 2011 Assessment and any other classification by the DOJ, FBI or the Center of the Juggalos, as a whole, as any kind of "gang," because these governmental actions violate the First Amendment right to freedom of association. For the same reason, Plaintiffs further request that the Court enjoin Defendants from taking action in the future that would brand Juggalos, as a group, as a criminal gang based on the actions of a relatively few people who may identify as Juggalos.

## COUNT 2: Administrative Procedure Act
### (Agency Action Contrary to the First Amendment's Freedom of Expression)

169.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs of this Complaint.

170.   Plaintiffs assert this separate, additional claim of a constitutional violation under § 706(2)(B) of the APA.

171.   The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

172.     The First Amendment protects the right of individuals to speak, write, make music, make art, and otherwise engage in expressive conduct. This right to freedom of expression also protects individuals' rights to attend musical events and concerts, to create and bear tattoo art, to express their association or affiliation with other individuals or groups, and to listen to speech about artistic, political and socio-economic matters.

173.     Plaintiffs intended their Juggalo tattoos, clothing, symbols and merchandise to express their identities as Juggalos and their affiliations with other Juggalos.

174.     Others objectively interpret and understand Juggalo tattoos, clothing, symbols and merchandise as expressions of the bearers' identification as Juggalos and their affiliations with other Juggalos. For example, the DOJ, FBI and the Center specifically rely on and interpret these Juggalo symbols to identify individual people as Juggalos and/or as people who affiliate with other Juggalos. The DOJ, FBI and the Center actively encourage state and local authorities to do the same, which those state and local authorities do as a result of such encouragement.

175.     By bearing Juggalo art, tattoos, clothing, symbols and merchandise, Plaintiffs engaged in protected expression.

176.     As part of the federal classification of the Juggalos as a gang, the DOJ, FBI and the Center identify Juggalos on the basis of their Juggalo tattoos, clothing, symbols and other merchandise and other protected expression.

177.     By identifying the Juggalos on the basis of their protected expression as targets for law enforcement action, the DOJ, FBI and/or the Center have engaged – and continue to engage – in content-based regulation.

178.    By targeting and/or taking action against the Juggalos due to their protected expression, the DOJ, FBI and the Center directly burden the Juggalos' (including the Plaintiffs') freedom of expression under the First Amendment.

179.    When identifying, targeting and/or taking action against the Juggalos due to their protected expression – including through the 2011 Assessment – the DOJ, FBI and the Center have actually and proximately caused other state and local law enforcement authorities to take actions that directly burden the Juggalos', including the Plaintiffs', freedom of expression under the First Amendment.

180.    The federal, state and local actions mentioned in this Count chill the freedom of expression of substantial numbers of Juggalos who are not members of any criminal street gang. Individual Juggalos, including Plaintiffs, have refrained from engaging in constitutionally protected expression for fear that it would result in his or her classification by federal law enforcement as a criminal gang member.

181.    By identifying Juggalos as criminal gang members through reference to their protected expression, the DOJ, FBI and the Center have reached a substantial amount of protected conduct. The classification is unconstitutionally overbroad.

WHEREFORE, Plaintiffs request that this Court enter an order under the APA holding unlawful and setting aside the 2011 Assessment and any other classification by the DOJ, FBI or the Center of the Juggalos, as a whole, as any kind of "gang," because these governmental actions violate the First Amendment right to freedom of expression. For the same reason, Plaintiffs further request that the Court enjoin Defendants from taking action in the future that would use Juggalo group-based symbols and expression to identify

individuals as members of a criminal gang, based on the actions of a relatively few people who may identify as Juggalos.

## COUNT 3: Administrative Procedure Act
### (Agency Action that Violates Due Process Under the Fifth Amendment)

182. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs of this Complaint.

183. Plaintiffs assert this separate, additional claim of a constitutional violation under § 706(2)(B) of the APA.

184. The Fifth Amendment to the United States Constitution provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

185. Under the Due Process Clause of the Fifth Amendment, federal laws, rules, regulations, and other similar legislative and administrative measures are unconstitutionally vague if they fail to give fair notice of the conduct that is forbidden or required by either (a) failing to inform the regulated parties what is required of them so that they may act accordingly; or (b) failing to provide enough precision and guidance to limit the discretion of those enforcing the law in order to avoid arbitrary or discriminatory law enforcement.

186. Where, as here, a federal criminal law-enforcement measure concerns protected First Amendment rights, the above anti-vagueness requirements of the Due Process Clause apply with particular strictness.

187. As used by the DOJ, the FBI and the Center, the terms "gang", "hybrid gang", and "Juggalo" are not fairly or clearly defined.

188.   The terms "gang" and "hybrid gang" do not have any settled or determined meaning, and they are strongly susceptible to subjective interpretation.

189.   The term "Juggalo" is strongly susceptible to subjective interpretation.

190.   The DOJ, FBI and Center's classification of the Juggalos as a gang:

   a.   has regulated Plaintiffs and other Juggalos on the basis of the Juggalos' status as Juggalos;

   b.   has failed to provide an affirmative, reasonably ascertainable standard of conduct; and

   c.   has failed to identify any particular prohibited actions that an individual Juggalo can avoid in order to avoid being considered a "hybrid gang" member, aside from renouncing or concealing their identity as a Juggalo.

191.   When classifying the Juggalos as a hybrid gang, the DOJ, FBI and the Center:

   a.   have not provided law enforcement officers with adequate guidance about how to distinguish the vast majority of law-abiding Juggalos from the small percentage of criminal individuals or subsets;

   b.   failed to meaningfully limit the discretion of law enforcement officers in deciding whether and how to take law enforcement action targeting criminal individuals or subsets of Juggalos; and

   c.   granted government officials so much discretion that individual officials' decisions to limit protected speech can rest on ambiguous and subjective reasons rather than being constrained by objective criteria.

192.   The DOJ, FBI and Center's classification of the Juggalos as a hybrid gang:

   a.   is vague and ambiguous; and

   b.   has a substantial chilling effect upon the exercise by Plaintiffs and other Juggalos of their rights to freedom of expression and association.

   WHEREFORE, Plaintiffs request that this Court enter an order under the APA holding unlawful and setting aside the 2011 Assessment and any other classification by the DOJ, FBI or the Center of the Juggalos, as a whole, as a "gang" or "hybrid gang" because

these governmental actions violate their right to Due Process. For the same reason, Plaintiffs further request that the Court enjoin Defendants from taking action in the future that would brand Juggalos, as a group, as a "gang" or "hybrid gang."

### COUNT 4: Administrative Procedure Act
### (Arbitrary and Capricious Agency Action)

193.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs of this Complaint.

194.    Plaintiffs assert this claim to challenge arbitrary and capricious agency action under § 706(2)(A) of the APA, which authorizes this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . .  arbitrary, capricious, [or] an abuse of discretion . . . ."

195.    The DOJ, FBI and the Center have not provided – and upon information and belief they do not have – a proper basis to explain their decision to depart from, add to, and/or amend the 2009 Assessment (which did not include the Juggalos as any kind of gang) and instead to identify the Juggalos as a "gang" in the 2011 Assessment.

196.    The DOJ, FBI and the Center have not provided – and upon information and belief they do not have – a proper basis to believe that the Juggalos, as a group, are a criminal street gang.

197.    The DOJ, FBI and the Center are in possession of information that the vast majority of Juggalos do not constitute and are not members of a criminal street gang.

198.    Insofar as the DOJ, FBI and Center have classified the Juggalos as a "criminal street gang" under federal law:

> a.    that classification is – as alleged and described above – an interpretive rule and a final agency action, which has adversely affected and aggrieved the Plaintiffs within the meaning of the APA;

b.  that classification lacks a proper factual basis, is implausible, and cannot be ascribed to a difference in view or the product of agency expertise;

c.  that classification is based on a failure to adequately develop the administrative record and to gather the evidence necessary to evaluate whether a criminal street gang exists in these circumstances;

d.  the DOJ, FBI and Center failed to reasonably consider and address the alternative of identifying criminal street gang members through their affiliations with known, established criminal street gangs rather than through their status as Juggalos.

199.    Insofar as the DOJ, FBI and Center have classified the Juggalos as a "criminal street gang" under federal law, that classification is arbitrary and capricious under the APA.

WHEREFORE, Plaintiffs request that this Court enter an order under the APA holding unlawful and setting aside the 2011 Assessment and any other classification by the DOJ, FBI or the Center designating the Juggalos as a criminal street gang because these governmental actions are arbitrary and capricious. For the same reason, Plaintiffs further request that the Court enjoin Defendants from taking action in the future that would brand Juggalos, as a group, as a criminal street gang based on the actions of a relatively few people who may identify as Juggalos.

## COUNT 5: Administrative Procedure Act
## (Agency Action that Fails to Observe Procedures Required by Law)

200.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs of this Complaint.

201.    Plaintiffs assert this claim under § 706(2)(D) of the APA, which authorizes this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."

202.   The DOJ, FBI and Center must comply with the provisions in the Code of Federal Regulations that provide "operating principles" for "Criminal Intelligence Systems Operating Policies." 28 C.F.R. § 23.20.

203.   The purpose of the "operating principles" is to "assure that all criminal intelligence systems operating through support under the Omnibus Crime Control and Safe Streets Act of 1968 . . . are utilized in conformance with the privacy and constitutional rights of individuals." 28 C.F.R. § 23.1. The "operating principles" are intended to confer important procedural benefits upon individuals.

204.   Under 28 C.F.R.§ 23.20(b): "A project shall not collect or maintain criminal intelligence information about the political, religious, or social views, associations, or activities of any individual or any group, association, corporation, business, partnership, or other organization unless such information directly relates to criminal conduct or activity and there is reasonable suspicion that the subject of the information is or may be involved in criminal conduct or activity."

205.   Pursuant to 28 C.F.R. § 23.20(c), "Reasonable Suspicion or Criminal Predicate is established when information exists which establishes sufficient facts to give a trained law enforcement or criminal investigative agency officer, investigator, or employee a basis to believe that there is a reasonable possibility that an individual or organization is involved in a definable criminal activity or enterprise. In an interjurisdictional intelligence system, the project is responsible for establishing the existence of reasonable suspicion of criminal activity either through examination of supporting information submitted by a participating agency or by delegation of this responsibility to a properly trained

participating agency which is subject to routine inspection and audit procedures established by the project."

206.    Under 28 C.F.R. § 23.20(l): "A project shall make assurances that there will be no harassment or interference with any lawful political activities as part of the intelligence operation."

207.    The Juggalos are a "group" or "association" within the meaning of 28 C.F.R. § 23.20(b).

208.    The Plaintiffs are "individuals" within the meaning of 28 C.F.R. § 23.20(b).

209.    The DOJ, FBI and Center have collected and/or maintained "criminal intelligence information" about the Juggalos' "political, religious, or social views, associations, or activities," within the meaning of 28 C.F.R. § 23.20(b).

210.    Upon information and belief, the DOJ, FBI and Center have collected and/or maintained "criminal intelligence information" about some or all of the Plaintiffs' "political, religious, or social views, associations, or activities," within the meaning of 28 C.F.R. § 23.20(b), because the Plaintiffs are Juggalos.

211.    Upon information and belief, the DOJ, FBI and Center have collected purported "criminal intelligence information" about the Juggalos and/or the Plaintiffs that fails to properly relate to definable criminal conduct or activity.

212.    The DOJ, FBI and Center have failed to provide – and upon information and belief they do not have – sufficient information to support a "reasonable suspicion" or a "reasonable possibility" that the Juggalos as a group "[are] involved in a definable criminal activity or enterprise," within the meaning of 28 C.F.R. § 23.20(c).

213.   The DOJ, FBI and Center have failed to provide – and upon information and belief they do not have – sufficient information to support a "reasonable suspicion" or a "reasonable possibility" that the Plaintiffs:

      a.     "[are] involved in a definable criminal activity or enterprise," within the meaning of 28 C.F.R. § 23.20(c); or

      b.     "[are] or may be involved in criminal conduct or activity," within the meaning of 28 C.F.R. § 23.20(b).

214.   The DOJ, FBI and Center have failed to provide – and upon information and belief they do not have – sufficient information to show that they have made "assurances that there will be no harassment or interference with any lawful political activities as part of the intelligence operation," within the meaning of 28 C.F.R. § 23.20(l).

WHEREFORE, Plaintiffs request that this Court enter an order under the APA:

(a) requiring the DOJ to expunge and eliminate purported "criminal intelligence information" concerning the Juggalos from NGIC Online, Law Enforcement Online, and any other gang intelligence database under its control;

(b) prohibiting and enjoining the DOJ, FBI or the Center from gathering purported "criminal intelligence information" about the Juggalos, as a whole group, unless and until the DOJ has sufficient facts to give a trained law enforcement or criminal investigative agency officer, investigator, or employee a basis to believe that the Juggalos, as a whole group, are involved in a definable criminal activity or enterprise; and

(c) prohibiting and enjoining the DOJ, FBI or the Center from including within its collection of criminal intelligence information any information about an individual's status as a Juggalo, in general, unless and until the DOJ has sufficient facts to give a trained law enforcement or criminal investigative agency officer, investigator, or employee a basis to believe that the Juggalos, as a whole group, are involved in a definable criminal activity or enterprise.

## COUNT 6: Declaratory Judgment Act

215.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs of this Complaint.

216.    Plaintiffs assert this claim for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, which authorizes the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

217.    Upon information and belief, the DOJ and FBI currently have collected the most complete repositories within the United States of information from international, federal, state and local governmental authorities on the subject of whether Juggalos are involved in any activity related to criminal street gangs.

218.    For the reasons set forth above, the information referenced in the immediately preceding paragraph is not sufficient

    a.    to overcome the First Amendment's prohibition here on classifying the Juggalos as any kind of criminal "gang."

    b.    to overcome the Due Process Clause's prohibition here on the vague and otherwise constitutionally deficient classification of the Juggalos as any kind of criminal "gang."

WHEREFORE, Plaintiffs request that this Court enter a declaratory judgment holding that federal designations of the Juggalos, as a whole, as any kind of criminal "gang" are unlawful because they violate the First and Fifth Amendments.

## PRAYER FOR RELIEF

For the reasons set forth above, Plaintiffs respectfully request that this Court:

(1) Enter an order under the APA:

    (a) holding unlawful and setting aside the 2011 Assessment and any other classification by the DOJ, FBI or the Center of the Juggalos, as a whole, as a

"gang" or a "hybrid gang" because those governmental actions are unconstitutional;

(b) holding unlawful any classifications by the DOJ, FBI or the Center of the Juggalos, as a whole, as a "criminal street gang" because those governmental actions are arbitrary and capricious;

(c) requiring the DOJ to expunge and eliminate purported "criminal intelligence information" concerning the Juggalos from NGIC Online, Law Enforcement Online, and any other gang intelligence database under its control, because such information was collected and maintained in violation of the legally required procedures;

(d) prohibiting and enjoining the DOJ, FBI and the Center from gathering purported "criminal intelligence information" about the Juggalos, as a whole, unless and until the DOJ has sufficient facts to give a trained law enforcement or criminal investigative agency officer, investigator, or employee a basis to believe that the Juggalos, as a whole, are involved in a definable criminal activity or enterprise; and

(e) prohibiting and enjoining the DOJ, FBI and the Center from including within its collection and/or database of criminal intelligence information any information about an individual's status as a Juggalo, in general, unless and until the requirements of subparagraph (d) above are met.

(2) Declare, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the governmental designation of "Juggalos," as a whole, as a "gang" or a "hybrid gang" is unconstitutional under the First and Fifth Amendments to the United States Constitution.

(3) Award costs and reasonable attorneys' fees.

(4) Grant such other and further relief as the Court deems just and proper.


Respectfully submitted,

/s/ Saura J. Sahu
Saura J. Sahu (P69627)
Miller, Canfield, Paddock and Stone, P.L.C.
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420
sahu@millercanfield.com

/s/ Howard Hertz
Howard Hertz (P26653)
Elizabeth C. Thomson (P53579)
Hertz Schram, P.C.
1760 South Telegraph Road
Bloomfield Hills, Michigan 48302
(248) 335-5000
hhertz@hertzschram.com

2:14-cv-10071-RHC-PJK   Doc # 1   Filed 01/08/14   Pg 38 of 38   Pg ID 38

Michael J. Steinberg (P43085)
Daniel S. Korobkin (P72842)
Kary L. Moss (P49759)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Avenue
Detroit, Michigan 48201
(313) 578-6814
msteinberg@aclumich.org
dkorobkin@aclumich.org

Attorneys for Plaintiffs
Parsons, Bradley, Gandy and Hellin

Farris F. Haddad (P71538)
Farris F. Haddad & Associates, P.C.
26100 American Drive, Suite 605
Southfield, Michigan 48034
(888) 818-1646
Farris@CallFarris.com

Attorneys for Plaintiffs Bruce and Utsler

Dated: January 8, 2014

21394489