# UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  September 17, 2015

Mr. Howard Hertz
Hertz Schram
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302

Mr. Daniel S. Korobkin
American Civil Liberties Union Of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Ms. Emily C. Palacios
Miller Canfield
101 N. Main Street, Seventh Floor
Ann Arbor, MI 48104

Ms. Lindsey Powell
U. S. Department of Justice
950 Pennsylvania Avenue, N.W.
Room 7226
Washington, DC 20530

Mr. Michael S. Raab
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Saura James Sahu
Miller Canfield
150 W. Jefferson Avenue, Suite 2500
Detroit, MI 48226

Mr. Michael Jay Steinberg
American Civil Liberties Union Of Michigan
2966 Woodward Avenue
Detroit, MI 48201

       Re: Case No. 14-1848*, Mark Parsons, et al v. DOJ, et al*
          Originating Case No. : 2:14-cv-10071

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                 Yours very truly,

                 Deborah S. Hunt, Clerk


                 Cathryn Lovely
                 Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0230p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————

MARK PARSONS; BRANDON BRADLEY; SCOTT
GANDY; ROBERT HELLIN; JOSEPH F. BRUCE; JOSEPH
W. UTSLER,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES DEPARTMENT OF JUSTICE; FEDERAL
BUREAU OF INVESTIGATION,

*Defendants-Appellees*.

No. 14-1848

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-10071—Robert H. Cleland, District Judge.

Argued: June 18, 2015

Decided and Filed: September 17, 2015

Before: ROGERS and McKEAGUE, Circuit Judges; SARGUS, District Judge.[*]

———————

## COUNSEL

**ARGUED:** Saura J. Sahu, MILLER, CANFIELD, PADDOCK AND STONE, PLC, Detroit, Michigan, for Appellants. Lindsey Powell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Saura J. Sahu, Emily C. Palacios, MILLER, CANFIELD, PADDOCK AND STONE, PLC, Detroit, Michigan, Michael J. Steinberg, Daniel S. Korobkin, ACLU FUND OF MICHIGAN, Detroit, Michigan, Howard Hertz, HERTZ SCHRAM PC, Bloomfield Hills, Michigan, for Appellants. Lindsey Powell, Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

[*]The Honorable Edmund A. Sargus, Jr., Chief United States District Judge for the Southern District of Ohio, sitting by designation.

1

---

## OPINION

---

SARGUS, District Judge.  Plaintiffs appeal the district court's dismissal of this action for lack of standing.  We REVERSE and REMAND.

## OVERVIEW

This is a case about fans of the Insane Clown Posse, who call themselves "Juggalos," and their ability to bring a lawsuit against government law enforcement agencies for alleged violations of their constitutional rights.  The Insane Clown Posse is a commercially successful musical art group whose fans self-identify as "Juggalos."  Juggalos are easily spotted because they frequently display, on person or property, insignia representative of the band.  In 2011, the National Gang Intelligence Center—an informational center operating under the Federal Bureau of Investigation—released a congressionally-mandated report on gang activity that included a section on Juggalos.  The report identified Juggalos as a "hybrid gang" and relayed information about criminal activity committed by Juggalo subsets.  Plaintiff-Juggalos allege that they subsequently suffered violations of their First and Fifth Amendment constitutional rights at the hands of state and local law enforcement officers who were motivated to commit the injuries in question due to the identification of Juggalos as a criminal gang.  Plaintiffs filed suit against the Department of Justice and Federal Bureau of Investigation under the Administrative Procedure Act and the Declaratory Judgment Act.  The district court dismissed for lack of standing.  For the reasons that follow we **REVERSE** the dismissal and **REMAND** the case for consideration of Defendants' Fed. R. Civ. P. 12(b)(6) arguments.

## I.  BACKGROUND

### A.  Factual Background

Because this case is before us on a motion to dismiss, we "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir. 1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  When considering whether pleadings make out a justiciable case for

want of standing, our analysis must be confined to the four corners of the complaint.  *Id*. at 1347 n.4.

### 1.  Musical Group ICP and Juggalos

The Insane Clown Posse ("ICP") is a musical group formed in 1991 and based in Farmingham Hills, Michigan.  The group is well known for elaborate live performances and has enjoyed substantial commercial success.  ICP's songs "often use harsh language and themes" that deal with social, political, religious or counter-cultural issues.  (R. 1 ¶ 22).  Specifically, ICP's music ranges from songs with "hopeful, life-affirming themes about the wonders of life and the support that Juggalos give to one another," to "horrorcore hip hop"—music that "uses very harsh language to tell nightmare-like stories with an underlying message that horrible things happen to people who choose evil over good."  (*Id.* ¶ 3).

Members of ICP's dedicated musical fan base—fans of ICP and other bands on ICP's independent record label, Psychopathic Records—are widely known as "Juggalos."  "As an expression of their identity, Juggalos often obtain and display distinctive tattoos of ICP and Psychopathic Record art and icons.  They also wear and otherwise display ICP art, symbols and insignia on their clothing and other personal belongings."  (*Id.* ¶ 24).  These displays of identity include the practice of painting their faces to look like clowns and often incorporate the "hatchetman" logo—a distinctive Juggalo symbol.

Plaintiffs self-identify as Juggalos.  "Juggalos gather and associate with each other to listen to ICP's music, to share ideas surrounding the music, to express their support of or interest in the ideas that ICP expresses through its music, to express their affiliation with ICP and the artists on its record label, and to express their affiliation with one another."  (*Id.* ¶ 25).

### 2.  Defendants and the National Gang Intelligence Center

Defendant Department of Justice ("DOJ") is a department of the United States government.  Defendant Federal Bureau of Investigation ("FBI") is an agency housed within the DOJ.  In 2005, Congress directed the U.S. Attorney General, through Public Law 109-162, 119 Stat. 2960, to "establish a National Gang Intelligence Center ('NGIC') and gang information database to be housed at and administered by the [FBI] to collect, analyze, and disseminate gang

activity information from the FBI, the Bureau of Prisons, the Drug Enforcement Administration, other federal agencies, and state and local law enforcement, prosecutors, and correctional officers." (*Id.* ¶ 100). In the same federal statute, Congress directed the NGIC to make the information available to federal, state and local law enforcement agencies, among others. The statute also directed the NGIC to annually submit a report to Congress on gang activity. "The DOJ promptly established the Center in response to Congress's direction and . . . the FBI has administered the Center since its inception." (*Id.* ¶ 101).

In 2011, the NGIC published its 2011 National Gang Threat Assessment (the "2011 NGIC Report," or "Report"), in which the NGIC summarized and reported information it had collected and analyzed in relation to gangs. "According to the [NGIC], the [2011 NGIC Report] 'supports [DOJ] strategic objectives 2.2 (to reduce the threat, incidence, and prevalence of violent crime) and 2.4 (to reduce the threat, trafficking, use and related violence of illegal drugs).'" (*Id.* ¶ 121). The 2011 NGIC Report "is based on federal, state, local, and tribal law enforcement and corrections agency intelligence . . . ." (*Id.* at ¶ 122). From its publication through at least the time of the filing of the Complaint in this case, the 2011 NGIC Report has been available to the general public on the NGIC website. *See* https://www.fbi.gov/stats-services/publications/2011-national-gang-threat-assessment.

In the 2011 NGIC Report, Juggalos are classified as a "loosely-organized hybrid gang." (*Id.* ¶ 132). The Report defines hybrid-gangs as "non-traditional gangs with multiple affiliations" that "are adopting national symbols and gang members often crossover from gang to gang." (*Id.* ¶ 131). The Report further states the following:

- "Many Juggalo subsets exhibit gang-like behavior and engage in criminal activity and violence."

- "Most crimes committed by Juggalos are sporadic, disorganized, individualistic, and often involve simple assault, personal drug use and possession, petty theft and vandalism."

- "A small number of Juggalos are forming more organized subsets and engaging in more gang-like criminal activity, such as felony assaults, thefts, robberies, and drug sales."

- "Juggalos' disorganization and lack of structure within their groups, coupled with their transient nature, makes it difficult to classify them and identify their members and migration patterns."

(*Id*. ¶ 140). The Report also notes that Arizona, California, Pennsylvania and Utah are the only states officially recognizing Juggalos as a gang, but that Juggalo gang-related criminal activity is reported in other states.

### 3. Plaintiffs' Alleged Injuries

#### a. Plaintiff Mark Parsons ("Parsons")

On July 9, 2013, Parsons was riding with a driver-trainee in a semi-truck on an interstate freeway outside Knoxville, Tennessee for his small trucking business, entitled "Juggalo Express LLC." The side of Parsons' truck was decorated with a large, visible ICP "hatchetman" logo. (*Id*. ¶¶ 31-34). Parsons and the trainee pulled into the bypass lane of a weigh station, where a Tennessee State Trooper ordered them to stop and park for a safety inspection. Once they parked, the State Trooper approached Parsons and asked if he was a Juggalo. (*Id*. ¶¶ 34-37). The State Trooper indicated that he detained Parsons for an inspection due to the hatchetman logo on the truck. He then indicated that he considered Juggalos to be a criminal gang because of the DOJ's designation. (*Id*. ¶¶ 38-39). He proceeded to detain and question Parsons about whether he had any axes, hatchets or other similar instruments in the vehicle. He searched the vehicle and continued to question Parsons for about an hour, during which time he did not find any weapons or contraband and did not issue a ticket or a citation to Parsons. (*Id*. ¶¶ 40-41).

#### b. Plaintiff Brandon Bradley ("Bradley")

Bradley has been detained numerous times by law enforcement officers in California due to visible Juggalo insignia on his person or clothing. In September 2012, a Citrus Heights, California Police Officer in a patrol car stopped Bradley while he was biking. Bradley's Juggalo tattoos were visible and he was wearing a Juggalo merchandise T-shirt. (*Id*. ¶¶ 47-48). The officer detained Bradley for fifteen minutes while questioning him about being a Juggalo. (*Id*. ¶ 52). "Later, an ex-Citrus Heights Police Officer told Bradley that the ex-officer heard about the above encounter" and also told Bradley "the tattoos are gang-affiliated." (*Id*. ¶ 54).

In October 2012, Bradley was stopped by a deputy from the Sacramento Sheriff's Department while walking across a street in downtown Sacramento. Bradley was wearing a shirt bearing ICP-related insignia and some of his tattoos were visible. After confirming Bradley self-identified as a Juggalo, the deputy asked to see Bradley's identification. (*Id.* ¶¶ 55-60). The deputy took Bradley's identification and ICP-themed wallet, ran a background check on Bradley and detained and questioned Bradley for "a substantial amount of time, during which the deputy accused Bradley of being in a gang because he was a Juggalo. The deputy stated that to be a Juggalo is to be a gang member. The deputy also asked Bradley about his ICP-related tattoos." (*Id.* ¶¶ 60-63).

In January 2013, Bradley was walking while wearing an ICP jacket with a large red "hatchetman" insignia on the back. Two police officers pulled up in a cruiser and stopped him. They told Bradley they noticed his jacket with the "hatchetman" insignia and ordered him to stand in front of a guardrail with his back to them so they could take pictures of it. They also took photographs of his face and his tattoos. (*Id.* ¶¶ 64-70). The officers "interrogated Bradley about his status as a Juggalo and about whether he was a gang member." (*Id.* ¶ 71).

### c. Plaintiff Scott Gandy ("Gandy")

Gandy has large ICP-related tattoos on his chest. (*Id.* ¶ 79). In 2012, Gandy visited an Army recruiting office where he was asked if he had any tattoos. (*Id.* ¶¶ 78, 80). Upon displaying his tattoos, Gandy was told by the Army's recruiting Sergeant that Juggalos "were on the federal government's gang list." The Sergeant said that he "considered Gandy's Juggalo tattoos to be gang-related" and then "questioned Gandy about whether he was a gang member." (*Id.* ¶¶ 81-82). "The Sergeant instructed Gandy that he must remove or permanently cover his Juggalo tattoos or the Army would immediately deny his recruitment application." (*Id.* ¶ 83). As a result of this instruction, Gandy went through the painful and costly procedure of covering his Juggalo tattoos with other tattoos. He returned to the recruitment office, showed the Sergeant his new tattoos and received approval for his application to be considered. However, Gandy was ultimately denied a position. (*Id.* ¶¶ 86-88).

*Parsons v. United States Dep't of Justice*

### d. Plaintiff Robert Hellin ("Hellin")

Hellin has visible ICP-related tattoos. (*Id.* ¶ 92). He enlisted in the Army in 2008 and is currently a corporal. (*Id.* ¶ 91). Hellin believes that, because of the Juggalo gang designation, his identity as a Juggalo "places him in imminent danger of suffering discipline or an involuntary discharge from the Army." (*Id.* ¶ 93).

### e. Plaintiffs Joseph Bruce ("Bruce") and Joseph Utsler ("Utsler")

Bruce and Utsler are members of ICP. (*Id.* ¶ 94). In August 2012, they contracted with AEG Live to perform at the Royal Oak Music Theater in Royal Oak, Michigan for their annual musical event known as "Hallowicked," to be held in October 2012. On October 8, 2012, the Royal Oak Music Theater cancelled Hallowicked without prior notice. (*Id.* ¶¶ 96-97). "After discussions with AEG Live and Royal Oak Music Theater, ICP's record label discovered that the Royal Oak Police Department asked the Royal Oak Music Theater to cancel the event. When asking the Royal Oak Music Theater to cancel the Hallowicked event, the Royal Oak Police Department cited the federal Juggalo gang designation." (*Id.* ¶¶ 98-99).

## B. Procedural Background

Plaintiff-appellants Parsons, Bradley, Gandy, Hellin, Bruce, and Utsler (the "Juggalos") filed suit against the DOJ and FBI (the "Agencies") asserting claims under the Administrative Procedure Act ("APA") and various constitutional provisions.[1] Specifically, the Juggalos allege that the 2011 NGIC Report violated their rights under the First and Fifth Amendments to the U.S. Constitution (Claims 1-3), was arbitrary and capricious (Claim 4), and failed to observe procedures required by law (Claim 5). The Juggalos also seek relief under the Declaratory Judgment Act ("DJA") (Claim 6).

The Agencies moved to dismiss the complaint on April 9, 2014, arguing, under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), that the Juggalos lacked constitutional standing and also had failed to state a claim.

---

[1] The Juggalos bring their first five claims under the Administrative Procedure Act. Their first three claims specifically state First and Fifth Amendment violations.

In June 2014, the district court granted the motion to dismiss based on the Juggalos' failure to satisfy the requisite three-part test for standing: (1) injury in fact; (2) causation; and (3) redressability. The district court held that Hellin had not demonstrated an injury in fact because he failed to allege any injury he had suffered. His fears that the Army might take action against him at some point in the future did not demonstrate that injury existed or was fairly impending. As for the remaining five plaintiffs, the district court found that causation and redressability were not satisfied because their alleged injuries were independent actions taken by third-parties who were not before the court. The district court also held that the Juggalos had forfeited an argument that they had standing to assert the DJA claim even in the absence of standing to assert their other claims. Having reached the dispositive standing issue, the court did not consider the Agencies' failure to state a claim argument.

## II. ARTICLE III STANDING

Motions to dismiss for lack of standing are reviewed *de novo*. *Miller v. Cincinnati*, 622 F.3d 524, 531 (6th Cir. 2010).

"The threshold question in every federal case is whether the court has the judicial power to entertain the suit." *National Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Article III of the United States Constitution prescribes that federal courts may exercise jurisdiction only where an actual "case or controversy" exists. *See* U.S. Const. art. III, § 2. Courts have explained the "case or controversy" requirement through a series of "justiciability doctrines," including, "perhaps the most important," that a litigant must have "standing" to invoke the jurisdiction of the federal courts. *Magaw*, 132 F.3d at 279.

The Supreme Court has enumerated the following elements necessary to establishing standing:

> First, Plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted). The standing inquiry is particularly rigorous when reaching the merits of the dispute "would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)).

A plaintiff must have standing for each claim pursued in federal court. *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). However, only one plaintiff needs to have standing in order for the suit to move forward. *See Horne v. Flores*, 557 U.S. 433, 446-47 (2009) ("[T]he critical question is whether at least one petitioner has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction."); *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Defenders of Wildlife*, 504 U.S. at 561; *accord Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir. 1996).

## A. Injury in Fact

The injury prong of the standing doctrine requires that the harm be actual or imminent. In other words, the harm must have already occurred or it must be likely to occur "imminently." *Defenders of Wildlife*, 504 U.S. at 560. "Imminent" in this context is defined as "certainly impending," in contradistinction to "allegations of possible future injury." *Clapper*, 133 S. Ct. at 1147. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Defenders of Wildlife*, 504 U.S. at 561 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)). Moreover, the injury must be to a legally cognizable right. *McConnell v. FEC*, 540 U.S. 93 (2003) (overruled

on other grounds); *Citizens United v. FEC*, 558 U.S. 310 (2010); *Diamond v. Charles*, 476 U.S. 54, 64 (1986).

The Juggalos claim the following injuries resulted from the 2011 NGIC Report: chilling effects on their freedoms of speech and association; stigmatic reputational injury; and various harms inflicted by third-party law enforcement agencies, such as improper stops, detentions, interrogations, searches, denial of employment, and interference with contractual relations.

**1. First Amendment & Due Process Claims (1-3)**

The Agencies assert that the alleged First Amendment and reputational injuries are too speculative and too generalized to establish an injury in fact.

To satisfy the injury in fact requirement on an allegation of chilled speech, the repercussions responsible for the chilling effect must be imminent. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

Generally, standing is found based on First Amendment violations where the rule, policy or law in question has explicitly prohibited or proscribed conduct on the part of the plaintiff. *See, e.g.*, *Nat'l Right to Life PAC v. Connor*, 323 F.3d 684 (8th Cir. 2003) (Missouri election provisions required out-of-state committees to have an in-state treasurer and deposit account if annual spending exceeded $1500); *Clapper*, 133 S. Ct. at 1153 (noting that case law does not "hold[] or even suggest[] that plaintiffs can establish standing simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part"). Here, the 2011 NGTA Report does not "regulate, constrain, or compel any action" on the part of the plaintiffs. *Clapper*, 133 S. Ct. at 1153. The chilling effect alone, therefore, does not constitute an injury in fact. *See Morrison v. Bd. of Educ.*, 521 F.3d 602, 609-610 (6th Cir. 2008) ("First Amendment chill typically constitutes the 'reason why the governmental imposition is invalid rather than the harm which entitles a party to challenge it.'") (quoting *Adult Video Assoc. v. Dep't of Justice*, 71 F.3d 563, 566 (6th Cir. 1995)).

Reputational injury, on the other hand, is sufficient to establish an injury in fact.  *Meese v. Keene*, 481 U.S. 465, 473-76 (1987) (exhibitor of foreign films had standing to challenge the DOJ's label of certain films as "political propaganda"); *Turkish Coal. Of Am., Inc. v. Bruininks*, 678 F.3d 617, 622-23 (8th Cir. 2012) (cognizable injury to reputation pled resulting from defendant labeling plaintiff's website  "unreliable"); *NCAA v. Governor of N.J.*, 730 F.3d 208, 220-22 (3d Cir. 2013) (injury in fact requirement satisfied by evidence that sports leagues' reputations would be harmed by legalized gambling on games); *Foretich v. U.S.*, 351 F.3d 1198, 1213 (D.C. Cir. 2003) ("Case law is clear that where reputational injury derives directly from an unexpired and unretracted government action, that injury satisfies the requirements of Article III standing to challenge the action.").    Specifically, where claims of a chilling effect are accompanied by concrete allegations of reputational harm, the plaintiff has shown injury in fact. *Meese*, 481 U.S. at 473-75.  In *Meese*, the Supreme Court noted that the plaintiff would not have had standing had he merely alleged a chilling effect, but by introducing affidavits stating that his reputation would suffer if he showed films designated by the government as "political propaganda," plaintiff cleared the injury in fact hurdle.  *Id*. at 473-74.  *Cf. Laird*, 408 U.S. at 10-11 (rejecting argument that the plaintiffs' First Amendment rights were being "chilled by the mere existence, *without more*, of [the Army's] investigative and data-gathering activity") (emphasis added).

The Juggalos' allegations that their First Amendment rights are being chilled are accompanied by allegations of concrete reputational injuries resulting in allegedly improper stops, detentions, interrogations, searches, denial of employment, and interference with contractual relations.  Stigmatization also constitutes an injury in fact for standing purposes. *Heckler v. Matthews*, 465 U.S. 728, 739-40 (1984).  As required, these reputational injuries are cognizable claims under First Amendment and due process causes of action.  *Meese*, 481 U.S. at 473-74; *see Paul v. Davis*, 424 U.S. 693, 710 (1976) (where reputational injury is accompanied by concrete harm, such as termination of employment, cognizable claim under Due Process Clause exists).  For the reasons stated above, the injury in fact requirement was satisfied as to the First Amendment and due process claims.

### 2.  Procedural Claims (4-5)

Claims for violations of procedural rights are treated uniquely under the standing inquiry. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Defenders of Wildlife*, 504 U.S. at 572, n.7; *accord Wright v. O'Day*, 706 F.3d 769, 771-72 (6th Cir. 2013); *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 579 (6th Cir. 2014).  However, in order to sustain a claim for procedural injury for standing purposes, "the procedures in question [must be] designed to protect some threatened concrete interest of [plaintiff's] that is the ultimate basis of his standing." *Defenders of Wildlife*, 504 U.S. at 573, n.8.  Additionally, the plaintiff must suffer a concrete injury as a result of the disregarded procedural requirement.  *Wright*, 706 F.3d at 772. Consequently, the 2011 NGIC Report—the agency "action, finding or conclusion"—at issue here must be designed to protect some threatened concrete interest of plaintiffs, such that the alleged arbitrary, capricious and contrary to law nature of the report is personally injurious to them.

*Wright* is instructive on this point.  We found that freedom from placement on a child-abuser registry is a sufficiently concrete interest to establish standing on a procedural due process claim.  706 F.3d at 772.  The Juggalos allege that they have suffered reputational injury and have been harassed, detained and otherwise mistreated by law enforcement officers as a result of the compilation of information and analyses on Juggalos contained within the 2011 NGIC Report. These alleged injuries are concrete and particular to the Appellant-Juggalos, rather than the general population of citizens suffering no adverse effects as a result of the inclusion of the Juggalo subsection.  *Cf. Defenders of Wildlife*, 504 U.S. at 572 (no concrete or particular injury to plaintiffs with generalized grievance against statute); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (no standing for environmental groups to challenge U.S. Forest Service regulation in absence of dispute over application of regulations).  As in *Wright*, Appellant-Juggalos are the "object of the challenged action"—the placement of Juggalos in the 2011 NGIC Report.  *Id*.  Thus, their freedom from placement in the 2011 NGIC Report is a sufficiently concrete interest to establish a procedural injury in fact.  We find the Juggalos have established an injury in fact on their procedural APA claims.

**B. Causation**

The second prong of the Article-III standing test requires the Juggalos to show that the injury "fairly can be traced to the challenged action." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). The causation need not be proximate. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014). To that end, the fact that an injury is indirect does not destroy standing as a matter of course. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 (1973) (indirect "attenuated line of causation to the eventual injury" was sufficient to satisfy standing requirements at the pleading stage). A defendant's actions may have directly affected someone other than the plaintiff. *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *Meese*, 481 U.S. at 472-77. However, the Supreme Court has cautioned that standing, albeit not precluded, is generally more difficult to establish when the injury is indirect. *Summers*, 555 U.S. at 493; *Allen*, 468 U.S. at 751.

The district court found that the Juggalos failed to demonstrate causation because the third-party law enforcement officials exercised independent judgment in committing the alleged injuries. (R. 29, at 9-12). The district court relied on *Defenders of Wildlife* and *Clapper* in drawing its conclusion. (*Id*). Both are distinguishable.

In *Defenders of Wildlife*, the Supreme Court did not hold that the plaintiffs failed to satisfy the causation element of standing—only that the plaintiffs failed to satisfy injury and redressability. 504 U.S. at 562. ("Respondents had not made the requisite demonstration of (at least) injury and redressability."). While the Court did enumerate a heightened standard for demonstrating causation in the case of indirect injury caused by a third party, it makes clear that such a standard is satisfied where the plaintiff was able to "adduce facts showing that [the third-party's] choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id*. Here, the Juggalos alleged facts demonstrating that their injuries were caused, at least in part, by the Agencies' actions in publishing the 2011 NGTA Report:

- Parsons alleged that the Tennessee State Trooper who stopped, detained and searched Parsons indicated that he considered Juggalos to be a criminal gang

based on the DOJ's designation and that he had stopped Parsons for an inspection because of the hatchetman logo on Parsons' truck.  (R. 1 ¶ 39).

- Gandy alleged that an Army Recruiting Sergeant told Gandy that Juggalos were a prohibited criminal gang based on the DOJ's Juggalo gang designation and, therefore, the Sergeant considered Gandy's tattoos to be gang-related.  (*Id.* ¶ 81).

- When asking the Royal Oak Music Theater to cancel Bruce and Utsler's Hallowicked concert, the Royal Oak Police Department cited the federal Juggalo designation.  (*Id.* ¶ 99).

This panel must accept as true these material allegations.  The Juggalos' allegations link the 2011 NGTA Report to their injuries by stating that the law enforcement officials themselves acknowledged that the DOJ gang designation had caused them to take the actions in question.  At this initial stage of the case, the Juggalos' allegations must suffice.  *See Lambert v. Hartman*, 517 F.3d 433, 435-38 (6th Cir. 2008).  Should the case proceed to discovery, the Agencies would have the opportunity to factually challenge the allegations.

In support of its finding that causation is broken by the independent law enforcement officers' voluntary conduct, the district court noted that the Agencies did not direct the third-party law enforcement entities to stop, detain and question Plaintiffs, or to cancel the Hallowicked concert.  (R. 29, at 10-11).  *See City of Detroit v. Secretary of Commerce*, 4 F.3d 1367, 1373 (6th Cir. 1993) (no causation due to "an independent act breaking the chain of causation between the challenged actions … and the injury to plaintiffs").  But, it is still possible to motivate harmful conduct without giving a direct order to engage in said conduct.  The Juggalos allege that the injurious third-party actions were motivated by the DOJ gang designation.  In the nebulous land of "fairly traceable," where causation means more than speculative but less than but-for, the allegation that a defendant's conduct was a motivating factor in the third party's injurious actions satisfies the requisite standard.

The district court also noted that the 2011 NGTA Report relied in part on individual States' designations of Juggalos as a gang,[2] "further complicating Plaintiff Bradley's theory of causation." (R. 29, at 10; *see also* 2011 National Gang Threat Assessment, at 22). However, courts have held that the fact that a defendant was one of multiple contributors to a plaintiff's injuries does not defeat causation. *Connecticut v. American Elec. Power Co., Inc.*, 582 F.3d 309, 345-47 (2d Cir. 2009), *rev'd on other grounds*, 131 S. Ct. 2527 (2011); *Libertarian Party of Va. v. Judd*, 718, F.3d 308, 316 (4th Cir. 2013) (causation is satisfied if witness residency requirement for gathering signatures on petitions was partially responsible for frustrating plaintiff's First Amendment rights, even where unrelated knee injury would also have hindered assertion of rights); *Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011) (causation satisfied where defendant's listing of plaintiff's property as "impaired water body" may have only been one contributing factor to decreasing property value). In *American Elec. Power Co.*, the Second Circuit held that injuries were fairly traceable to the defendants' carbon dioxide emissions, even though third parties not before the court had also emitted carbon dioxide contributing to the plaintiffs' alleged injuries. 582 F.3d at 345-47. The Supreme Court affirmed the Second Circuit's exercise of jurisdiction in a divided opinion. Four Justices concluded that at least some plaintiffs had standing and four concluded that none had standing, with Justice Sotomayor taking no part in the decision. *Id.*

Resolution of this issue is not necessary in this case. The injuries alleged all occurred within law enforcement jurisdictions having ready access to the challenged report. Several occurred in states which had not previously designated the Juggalos as a gang. In these circumstances, we need not definitively address the multiple causation issue.

The Agencies' arguments on causation are also unavailing. The Agencies claim that the Juggalos fail to satisfy the pleading standards with respect to their allegations that the third-parties relied on the 2011 NGIC Report in improperly detaining, searching and otherwise mistreating the Juggalos. (Appellees Br. at 20-22). However, the test for standing is not whether the Juggalos met *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*,

---

[2]The district court noted that the 2011 NGTA Report relied on the State of California's designation of the Juggalos as a gang. (R. 29, at 10). The 2011 NGTA Report states that Arizona, California, Pennsylvania and Utah designate Juggalos as gangs. (Appellees Br., at A5).

550 U.S. 540 (2007) pleading requirements, but rather whether they have demonstrated their injuries to be fairly traceable to the Agencies' actions.[3] The Agencies seek to distinguish the cases relied upon by the Juggalos—*Lambert* and *Foretich*—through the level of detail provided in the plaintiffs' allegations pertaining to causation. Of course, causation to support standing is not synonymous with causation sufficient to support a claim. Nonetheless, the question of whether the causal nexus has been pled with particularity is not the question we now address. The Juggalos' allegations, which we must credit at the motion to dismiss stage, satisfy the fairly traceable requirement.

The Agencies also cite *Clapper*, in which the Supreme Court found that the plaintiffs' claimed injuries and causation theories were too speculative to establish an injury in fact that was fairly traceable to the defendants. 133 S. Ct. at 1150. We note that *Clapper* was dismissed for lack of standing at the summary judgment stage. The burden on the plaintiffs was therefore significantly higher—they could not rest on "mere allegations" but had to "set forth by affidavit or other evidence specific facts" demonstrating their injuries and causation. *Defenders of Wildlife*, 504 U.S. at 561. In this case, the Juggalos need only allege facts adducing that their injuries are fairly traceable to the Agencies' actions. Parsons, Gandy, Bruce and Utsler have done so with their allegations that law enforcement officers communicated the motivation behind their actions to be the DOJ's Juggalo gang designation.

## C. Redressability

The third prong of the Article III standing test is redressability, i.e. the relief the plaintiff is seeking must provide redress for the injury. An injury is redressable if a court order can provide "substantial and meaningful relief." *Larson v. Valente*, 456 U.S. 228, 243 (1982). "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Id*. at 244 n.15; *accord. Massachusetts v. EPA*, 549 U.S. 497, 525 (2007). The relevant standard is likelihood—whether it is "likely, as opposed to merely speculative, that the

---

[3]The Agencies raised 12(b)(6) arguments in their initial Motion to Dismiss before the district court. (R. 20, at 19-30). Because the lower court dismissed the action for lack of standing, it did not proceed to consider whether the Juggalos failed to state a claim. Neither party raised the 12(b)(6) arguments before this panel, with the exception of the Agencies' reference to pleading standards in their argument against causation.

injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC) Inc*., 528 U.S. 167, 181 (2000). Redressability is typically more difficult to establish where the prospective benefit to the plaintiff depends on the actions of independent actors. *See ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989).

The Juggalos have requested several forms of relief, including, *inter alia*: (1) an order declaring the 2011 NGIC Report unlawful and setting it aside; (2) an order holding the classification of Juggalos by the DOJ, FBI or NGIC as a "criminal street gang" to be unlawful; (3) an order requiring the Agencies to expunge all criminal intelligence information regarding the Juggalos from NGIC's databases; (4) injunctive relief prohibiting the Agencies from investigating, collecting information regarding or reporting on the criminal activities of Juggalos; and (5) a declaration that the designation of Juggalos as a "gang" or "hybrid gang" is unconstitutional, pursuant to the First and Fifth Amendments. The Agencies assert that only the first form of relief is available under the APA or the DJA, but even the broader relief sought by the Juggalos would not redress their injuries because reporting by state and local law enforcement and other entities would likely perpetuate the alleged injuries. (Appellees Br., at 14).

The Agencies argue that the alleged reputational harm and chilling effect would not be remedied by an order setting aside the 2011 NGIC Report because information about criminal activity performed by Juggalo subsets is available from a variety of other sources, including state and local law enforcement in the locations where the Juggalos were allegedly injured. (*Id*. at 21). In *Meese*, the defendant, the Attorney General, espoused an analogous argument—that enjoinment of the DOJ's label of certain films as "political propaganda" would not stem negative reaction to the plaintiff's exhibition of the films. 481 U.S. at 476-77. The Supreme Court disagreed, articulating that the harm to plaintiff occurred because "the Department of Justice has placed the legitimate force of its criminal enforcement powers behind the label of 'political propaganda.'" *Id*. at 477. The Juggalos in this case also suffer alleged harm due to the force of a DOJ informational label. While the 2011 NGIC Report is not the designation itself, it reflects the designation and includes an analytical component of the criminal activity performed by Juggalo subsets, classifying the activity as gang-like. As in *Meese*, "[a] judgment declaring the

[action in question] unconstitutional would eliminate the need to choose between [First Amendment-protected activity] and incurring the risk that public perception of this criminal enforcement scheme will harm appellee's reputation."  *Id.*

The Agencies also assert that an order declaring the 2011 NGIC Report unconstitutional would not alleviate the alleged harm entirely because the information on Juggalo activity is available through the aforementioned alternate channels.  But it need not be likely that the harm will be *entirely* redressed, as partial redress can also satisfy the standing requirement. *See Meese*, 481 U.S. at 476 ("enjoining the application of the words 'political propoganda' to the films would at least partially redress the reputational injury of which appellee complains"); *Laidlaw*, 528 U.S. at 185 (finding civil penalties sufficient to satisfy redressability noting that they have at least "*some* deterrent effect") (emphasis added).  "It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of a suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." *Laidlaw*, 528 U.S. at 185-86.  An order declaring the 2011 NGIC Report unconstitutional and setting it aside would abate the reflection of Juggalo criminal activity as gang or gang-like by the Agencies.  *Lambert* further buttresses this conclusion. 517 F.3d at 438.  The court held that Lambert had standing if she could likely show that the relief she was requesting "would not only combat future risk, but would also help to redress the past . . . injury that she has suffered."  *Id.*  The declaration the Juggalos seek would likely combat at least some future risk that they would be subjected to reputational harm and chill due to the force of the DOJ's criminal gang or gang-like designation.

The Agencies point to *Raisins Landscape & Assoc., Inc. v. Michigan Department of Transportation* as supportive of their argument that the Juggalos fail to satisfy redressability. 528 F. App'x 441 (6th Cir. 2013).  In *Raisins*, the plaintiff-landscaping corporation filed a complaint with the Michigan Department of Transportation (the "Department"), alleging that prime contractors who were hired by the Department and subsequently hired the plaintiff as a subcontractor failed to pay the plaintiff for duly completed work.  We held that the plaintiff did not have standing to pursue the claims, in part, because of a lack of redressability.  The plaintiff had not shown that it was likely that "a prime contractor would pay its debts even if sanctioned,"

the court explained.  *Id*. at 445.  While we cannot be certain whether and how the declaration sought by the Juggalos will affect third-party law enforcement officers, it is reasonable to assume a likelihood that the injury would be partially redressed where, as here, the Juggalos have alleged that the law enforcement officers violated their rights because of the 2011 NGIC Report. *See Foretich*, 351 F.3d at 1215 ("[s]uch a declaration will remove the imprimatur of government authority" from the 2011 NGIC Report).

The Agencies assert that "it is entirely conjectural whether the nonagency activity that affects respondents will be altered or affected by the agency activity they seek to achieve." *Defenders of Wildlife*, 504 U.S. at 571.  The "action agencies" here cannot be required to cease their behavior towards the Juggalos as they "are not directly bound as parties to the suit and otherwise not indirectly bound" because the 2011 NGIC Report does not prescribe regulations for conduct towards so-identified gangs.  *Id*. at 596 (Blackmum, J., dissenting) (summarizing majority opinion rationale for finding lack of redressability).  But the same rationale for why a non-prescriptive report can satisfy causation for the purposes of standing applies to redressability.  The Juggalos sufficiently allege that the reputational harm and chill was caused by the 2011 NGIC Report and under *Meese*, where reputational harm and chill will likely be alleviated by the relief sought, redressability exists.  We emphasize that our conclusion is based upon the allegations made in the Complaint.  We express no opinion as to the 12(b)(6) motion to dismiss or the merits of the case.

### III.  DECLARATORY JUDGMENT ACT CLAIM

The Juggalos argue that they did not forfeit standing to assert their DJA claim even in the absence of standing to assert their other claims.  In their Motion to Dismiss before the lower court, the Agencies argued that the statute does not provide a basis for jurisdiction and therefore the Juggalos' DJA allegations could not survive as an independent claim.  (R. 20, at 5 n.1).  The Juggalos assert that the DJA solely provides a form of relief, while jurisdiction comes from the underlying constitutional issues presented in the claim.  The Juggalos also assert that this argument was not waived because it was both included in their opposition memorandum to the Agencies' Motion to Dismiss and raised during oral argument.  (Appellants Br., at 17).  On appeal, the Agencies fail to argue that the DJA claim may not survive.  The Juggalos asserted in

their response to the Agencies' Motion to Dismiss that they appropriately pled the DJA as the basis of a claim for relief. Some of their arguments about the appropriateness of declaratory judgment as a remedy for constitutional violations could be construed as responsive to the Agencies' cursory attack on the DJA claim. This was minimally sufficient to avoid forfeiting this claim.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's decision to dismiss for lack of standing and **REMAND** the case for consideration of Defendants' 12(b)(6) failure to state a claim arguments.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 14-1848

MARK PARSONS; BRANDON BRADLEY;
SCOTT GANDY; ROBERT HELLIN;
JOSEPH F. BRUCE; JOSEPH W. UTSLER,
          Plaintiffs - Appellants,

          v.

UNITED STATES DEPARTMENT OF JUSTICE;
FEDERAL BUREAU OF INVESTIGATION,
          Defendants - Appellees.

> **FILED**
> Sep 17, 2015
> DEBORAH S. HUNT, Clerk

Before: ROGERS and McKEAGUE, Circuit Judges; SARGUS, District Judge.

**JUDGMENT**

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's dismissal for lack of standing is REVERSED, and the case is REMANDED for consideration of Defendants' 12(b)(6) failure to state a claim arguments.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk