UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK PARSONS, et. al.,

    Plaintiffs,

v.                                                  Case No. 14-10071

UNITED STATES DEPT. OF JUSTICE, et. al.,

    Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS**

Now before the court is a Motion to Dismiss filed by Defendants United States Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI"). (Dkt. # 37.) The matter is fully briefed, and the court finds that a hearing is unnecessary. *See* E.D. LR 7.1(f)(2). For the reasons discussed below, the court will grant Defendants' Motion.

**I. BACKGROUND**

As alleged in the complaint, "Juggalos" are "fans of the musical group Insane Clown Posse ("ICP")[1] and other bands on ICP's independent record label, Psychopathic Records." (Dkt. # 1, Pg. ID 2.) ICP's music is generally referred to as "horrorcore hip hop" which "uses very harsh language to tell nightmare-like stories . . . ." (*Id.*) Juggalos often paint their faces to look like clowns, and wear distinctive symbols, including the "hatchetman" logo, which depicts a person with wild hair wielding a butcher's meat cleaver. (*Id.*) The complaint alleges that "[m]any Juggalos embrace

'Juggaloism' as a philosophy, an identity, [and] a way of life. ICP's lyrics, through their description of a 'Dark Carnival,' address themes of good and evil, heaven and hell, and acceptance and tolerance of others." (*Id.* at Pg. ID 6.) These Juggalos observe "the moral code" of the Carnival, and see themselves as social outcasts, seeking support from one another. (*Id.* at Pg. ID 7.) "Based on these shared values, Juggalos strongly identify with one another and often refer to themselves as a 'family.'" (*Id.*) According to Plaintiffs, Juggalos gather to listen to ICP's performances, share ideas expressed in the ICP performances, and express their support for the band. (*Id.* at Pg. ID 6.)

### A. The 2011 National Gang Threat Assessment

Plaintiffs' allegations stem from the National Gang Intelligence Center's "2011 National Gang Threat Assessment: Emerging Trends" ("NGTA").[2] The NGTA states that its purpose is to "examine emerging gang trends and threats posed by criminal gangs to communities throughout the United States." *Id.* at 5. "It supports US Department of Justice strategic objectives 2.2 (to reduce the threat, incidence, and prevalence of violent crime) and 2.4 (to reduce the threat, trafficking, use, and related violence of illegal drugs)." *Id.* The NGTA further states that its data are based on federal, state, local, and tribal law enforcement reporting, as well as information supplied by correctional institutions. *Id.*

---

[1] ICP was founded in 1991 and based in Farmington Hills, Michigan. (Dkt. # 1, Pg. ID 5.) Its principal members are Plaintiffs Joseph Bruce and Joseph Utsler, who go by the stage names "Violent J" and "Shaggy 2 Dope," respectively. (*Id.* at Pg. ID 14.)

[2] National Gang Intelligence Center, *2011 National Gang Threat Assessment: Emerging Trends,* (2011), available at http://www.fbi.gov/stats-

In a section entitled "Non-Traditional Gangs," the 2011 NGTA notes that "[t]he expansion of hybrid gangs – non-traditional gangs with multiple affiliations – is a continued phenomenon in many jurisdictions nationwide." *Id.* at 22. The NGTA further observes that hybrid gangs are fluid in structure and size, present in at least 25 states, and that hybrid gang members commit a multitude of street and violent crime, including drug trafficking. *Id.* The report identifies Juggalos as a hybrid gang subset, and notes that Juggalo gangs are rapidly expanding into many communities. Arizona, California, Pennsylvania, and Utah are the only states that recognize Juggalos as a gang, but the NGTA reports that "at least 21 states have identified criminal Juggalo sub-sets." *Id.*

> Most crimes committed by Juggalos are sporadic, disorganized, individualistic, and often involve simple assault, personal drug use and possession, petty theft and vandalism. However, open source reporting suggests that a small number of Juggalos are forming more organized subsets and engaging in more gang-like criminal activity, such as felony assaults, thefts, robberies, and drug sales.

*Id.* at 22–23. The NGTA further reports that "Juggalo criminal activity has increased over the past several years and has expanded to several other states. Transient, criminal Juggalo groups pose a threat to communities due to the potential for violence, drug use/sales, and their general destructive and violent nature." *Id.* at 23. The NGTA also noted that Juggalos are known to have members in the U.S. Army and Air Force. *Id.* at 36–37.

---

services/publications/2011-national-gang-threat-assessment (June 9, 2014) (rendering of URL contains spaces).

**B. Alleged Harassment of Plaintiffs**

Plaintiff Mark Parsons owned and operated a small trucking business, "Juggalo Express LLC." (Dkt. # 1, Pg. ID 7.) His truck is decorated with a large ICP "hatchetman" logo. Parsons alleges that on July 9, 2013, a Tennessee State Trooper ordered him to stop his truck for a safety inspection. The state trooper asked Parsons if he was a Juggalo, and told Parsons that he had detained him because of the "hatchetman" logo on the truck. (*Id.* at Pg. ID 8.) The trooper further informed Parsons that he believed Juggalos to be a gang because of the DOJ's designation, and asked Parsons whether he had any axes, hatchets, or other chopping instruments in his truck. Parsons told the trooper that he did not have any such items in his truck, and an hour-long search of the truck and interrogation of Parsons revealed no weapons or contraband.

Plaintiff Brandon Bradley claims that police stopped him in order to interrogate him about his Juggalo affiliation. (*Id.* at Pg. ID 9.) In September 2012, a Citrus Hills, California, police officer stopped Bradley while he was biking home. Bradley had visible Juggalo tattoos and was wearing Juggalo merchandise, and avers that the officer stopped him because of Bradley's Juggalo-related apparel — the officer assumed he was a member of a gang. The officer allegedly detained Bradley for fifteen minutes, interrogated him about being a Juggalo, and took notes regarding Bradley's answers. Soon after the incident, an ex-Citrus Hills police officer told Bradley that he had heard about the incident, and that Bradley, an aspiring police officer, would have to get his Juggalo tattoos removed if he wanted to be a police officer because the tattoos were gang-related. Approximately a month later, a Sacramento police officer stopped

Bradley, requested Bradley's identification, and asked Bradley if he was a Juggalo. (*Id.* at Pg. ID 10.) The officer ran a background check on Bradley and accused Bradley of being in a gang, stating that "to be a Juggalo is to be a gang member." (*Id.*) In a final incident in January 2013, Bradley was walking alone in a bike lane when a police cruiser pulled up behind him and stopped him. Two officers exited the cruiser and told Bradley that they had noticed the "hatchetman" symbol on his jacket. They ordered him to stand in front of a guardrail so that they could take pictures of his jacket, face, and tattoos. (*Id.* at Pg. ID 11.) They questioned Bradley regarding his Juggalo affiliation, and insisted that he was part of a gang. As a result of these encounters, Bradley often chooses not to express his Juggalo affiliation, or wear Juggalo-related apparel.

Plaintiff Scott Gandy claims that in 2012, he visited a U.S. Army recruiting station, and that at the time, he had large ICP tattoos on his chest. The recruiting officer asked Gandy whether he had any tattoos, and told Gandy that because Juggalos were on the federal government's "gang list," he considered Gandy's tattoos to be gang-related. The officer questioned Gandy regarding his Juggalo affiliation, and instructed Gandy that he would have to remove or permanently cover his tattoos or the Army would immediately deny his application. Gandy subsequently spent hundreds of dollars to have his Juggalo tattoos covered with other tattoos. When he returned to the recruiting station, the officer accepted his application and told Gandy that he would receive consideration. Ultimately, the Army denied Gandy's application. (*Id.* at Pg. ID 12–13.)

Plaintiff Robert Hellin is currently a corporal in the Army and has a number of visible ICP tattoos, and avers that because of the federal government's designation of Juggalos as a hybrid gang, he is in imminent danger of discipline or involuntary discharge from the army. (*Id.* at Pg. ID 13.)

Plaintiffs Bruce and Utsler are members of ICP. They claim that on August 20, 2012, they contracted with AEG Live to perform at the Royal Oak Music Theater in Royal Oak, Michigan, for ICP's annual "Hallowicked" event. On October 8, 2012, the theater cancelled the event, informing Bruce and Utsler that its landlord prompted the cancellation. Further discussions with AEG Live and the Royal Oak Music Theater suggested that the Royal Oak Police Department asked the theater to cancel the event, citing the federal Juggalo gang designation as a motivating reason. (*Id.* at Pg. ID 14.)

On March 21, 2014, after Plaintiffs filed the instant suit, the National Gang Intelligence Center released its 2013 National Gang Report. Neither Juggalos nor "hybrid gangs" receive any mention therein.[3]

Defendants filed a Motion to Dismiss (Dkt. # 20), which the court granted on standing grounds (Dkt. # 29.) Defendants appealed and the Sixth Circuit, finding standing adequately shown, reversed and remanded. (Dkt. # 33.) Defendants then filed the instant Motion to Dismiss. (Dkt. # 37.)

## II. STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The court views the complaint in the light most favorable to the Plaintiff and accepts all well-pleaded factual allegations as true. *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009). The court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (quoting *Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir. 2000)).

To survive a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Bare allegations are not enough. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks omitted).

"In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also

---

[3] *See* National Gang Intelligence Center, *2013 National Gang Report*, available at http://www.fbi.gov/stats-services/publications/national-gang-report-2013/view (June 9,

may be taken into account." *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (quoting *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir.1997)).

### III. DISCUSSION

Plaintiffs' Complaint contains five counts alleging violations of the Administrative Procedures Act ("APA") and one under the Declaratory Judgment Act ("DJA"). (Dkt. # 1.) In Counts 1, 2, and 3, Plaintiffs assert that Defendants violated their constitutional rights of association, expression, and due process under the First and Fifth Amendments, respectively. (Dkt. # 1, Pg. ID 23-31.) Count 4 argues that the agencies' decision to classify Juggalos as a "hybrid gang" was "arbitrary and capricious." (*Id.* at Pg. ID 31.) In Count 5, Plaintiffs claim that the agency failed to observe the procedures required by law. Finally, in Count 6, Plaintiffs seek "a declaratory judgment holding that federal designations of the Juggalos, as a whole, as any kind of criminal 'gang' are unlawful." (*Id.* at Pg. Id 36.)

Defendants advance several independent theories to support their Motion to Dismiss. First, they argue that "Plaintiffs have not challenged a final agency action" as required to bring a claim under the APA (Dkt. # 37, Pg. ID 420); second, they claim the actions challenged under the APA are "committed to agency discretion" and therefore outside the court's subject matter jurisdiction (*Id.* at Pg. ID 422); third, they claim that "Plaintiffs have adequate alternative remedies," rendering their allegations unactionable (*Id.* at Pg. ID 424.) Defendants also argue that all six counts should be dismissed for failure to state a claim upon which relief may be granted. The court concludes that

---

2014).

Defendants are entitled to dismissal on several grounds, but will not reach all of Defendants' arguments.

### A. Final Agency Action

The APA allows aggrieved individuals to seek judicial review of agency decisions when the challenged action is either "made reviewable by statute" or is a "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. To be considered a "final agency action," it must satisfy two requirements:

> First, the challenged action must mark the consummation of the agency's decision making process. [*U.S. Army Corps. Of Eng'rs v. Hawkes Co.,* 136 S.Ct. 1807, 1813 (2016) (citing *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997))]. This means the action "must not be of a merely tentative or interlocutory nature," *Bennett,* 520 U.S. at 178, such that judicial review of the action would "disrupt the orderly process of adjudication," *Port of Bos. Marine Terminal Ass'n v. Rederkiaktiebolaget Transatlantic,* 400 U.S. 62, 71 (1970). Second the challenged action must determine rights and obligations of a party or cause legal consequences. *Hawkes Co.*, 136 S. Ct. at 1813 (citing *Bennett*, 520 U.S. at 177-18).

*Berry v. United States Dep't of Labor*, No. 15-6316, 2016 WL 4245459, at *3 (6th Cir. Aug. 11, 2016).

Here, Plaintiffs first allege, and Defendants do not dispute, that the NGTA was the "consummation of the [FBI's] decision making process." Neither tentative nor interlocutory, the report was generated pursuant to the Violence Against Women and DOJ Reauthorization Act, which the National Gang Intelligence Center within the FBI specifically "to collect, analyze, and disseminate gang activity information." Pub. L. No. 109-162, Title XI, § 1107(a), 119 Stat. 2960, 3093 (2006).

9

Second, Plaintiffs do not claim that the NGTA "determine[d] rights and obligations of [any] party." The one remaining question to determine whether this was a final agency action is whether the agency report "cause[d] legal consequences." It did not.

Plaintiffs argue "that the classification of Juggalos as criminal [sic] gang imposes direct legal consequences on Plaintiffs' constitutionally protected activity." (Dkt. # 42, Pg. ID 506.) They argue that the FBI's collection, analysis, and dissemination of gang activity information has caused Plaintiffs to "face unfavorable treatment in employment and business relationships, divorce and custody disputes, and law enforcement and prosecutorial activities." (*Id.* at Pg.ID 506-07.) Specifically, they allege that as a result of the NGTA's designation of Juggalos as a hybrid gang:

- Plaintiff Parsons was unconstitutionally seized, searched, and interrogated by a Tennessee State Trooper; (Dkt. # 1, Pg. ID 7);

- Plaintiff Bradley was "detained and questioned" by members of the Sacramento Sheriff's Department on three different occasions, (*id.* at Pg. ID 9-11);

- Plaintiff Gandy was told "he must remove or permanently cover his Juggalo tattoos or the Army would immediately deny his recruitment application", (*id.* at Pg. ID 12);

- Plaintiff Hellin is "in imminent danger of suffering discipline or an involuntary discharge from the Army" because of his Juggalo identity, (*id.* at Pg. ID 13); and

- the Royal Oak Music Theater cancelled Plaintiffs Bruce and Utsler's annual "Hallowicked" music event after contact by the Royal Oak Police Department, (*id.* at Pg. ID 14).

Every one of these alleged events, as specified, constitutes a decision to act that rests on the shoulders of others — the persons or entities who performed the alleged acts or took the alleged steps — and not the Defendants or the agency action at issue in this case. No allegation exists of Defendants acting to arrest or intimidate, or coercing similar actions on the part of third parties to the detriment of Plaintiffs. Even if there were such allegations, "coercive pressures [placed] on third parties" as a consequence of agency actions do not qualify as "legal consequences" and are therefore not reviewable under the APA. *Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. Envtl. Prot. Agency,* 313 F.3d 852, 859 (4th Cir. 2002). In *Flue-Cured Tobacco*, several tobacco companies argued that an EPA report "analyz[ing] the effects of secondhand smoke on human health" caused "legal consequences" because other federal agencies and private groups relied on the report to justify the adoption of regulations restricting tobacco use. 313 F.3d at 860-61. The Fourth Circuit, focusing on whether the effects were more than merely remote, disagreed, holding that the subsequent "regulations [were] not direct consequences of the Report, but [were] the product of independent agency decisionmaking [sic]" or "independent responses and choices of third parties." *Id.* at 860-61. As a result, the Circuit held that "[t]he actions and consequences complained of by plaintiffs do not legally flow from the Report nor are they the result of

11

legal rights or consequences created by the Report." *Id.* at 261. The Circuit went on to explain:

> Furthermore, as a practical matter and of considerable importance, if we were to adopt the position that agency actions producing only pressures on third parties were reviewable under the APA, then almost any agency policy or publication issued by the government would be subject to judicial review. We do not think that Congress intended to create private rights of actions to challenge the inevitable objectionable impressions created whenever controversial research by a federal agency is published. Such policy statements are properly challenged through the political process and not the courts.

*Id.* This court agrees with the Fourth Circuit's analysis and its concern about the offhand creation of private causes of action.

The Fourth Circuit returned to the issue in *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459-60 (4th Cir. 2004). The plaintiff in *Invention Submission* challenged the United States Patent and Trademark Office's advertising campaign to alert the public about "invention promotion scams" as arbitrary and capricious under the APA. *Id.* In particular, the plaintiff alleged that the campaign was false and led to a journalist publishing a story identifying plaintiff as one of the scams, which substantially harmed the plaintiff's business. *Id.* at 455. The Circuit, relying on *Flue-Cured Tobacco*, held that the harms to the plaintiff's business were "the decisions of members of the public . . . attributable to independent responses and choices of third parties and cannot be imputed to [the agency] for purposes of determining whether its conduct was a final agency action." *Id.* at 460 (quoting *Flue-Cured Tobacco*, 313 F.3d at 861) (internal quotation marks omitted).

Similarly, in *Franklin v. Massachusetts,* 505 U.S. 788, 790 (1992), Massachusetts challenged a report submitted to the President by the Secretary of Commerce tabulating the results of the most recent census and recommending the number of representatives that should be apportioned to each state. *Id.* The Supreme Court found that the Secretary's report did not constitute a final agency action because it "carrie[d] no direct consequences for reapportionment." *Id.* at 798. No legal consequences were triggered until the President issued a statement to Congress showing "the number of Representatives to which each State would be entitled." *Id.* at 792 (quoting 2 U.S.C. § 2a(a)). However persuasive the Secretary's report may have been to the President, it was still only a "tentative recommendation." *Id.* at 798.

As in *Franklin* and *Flue-Cured Tobacco,* none of the consequences complained of here by Plaintiffs (assuming them to be "legal consequences") are in any way directly caused by NGTA. Instead, each one is either "the product of independent agency decisionmaking [sic]" or an "independent response[] and choice[] of third parties." *Flue-Cured Tobacco,* 313 F.3d at 861.

Plaintiffs do not allege that the NGTA directs, authorizes, or empowers local police to stop or search Juggalos or object to ICP concerts. Nor do Plaintiffs claim that the armed services must discharge or refuse to consider applicants. However informational or influential the NGTA may have been to local law enforcement or Army recruiters, no alleged constitutional violations or any other consequences, "legal" or otherwise, emerged until local officials or members of *other* agencies — not the FBI, DOJ, or NGIC — decided to act.

13

Plaintiffs' present a misguided argument focused on the "classification," not the publication, as the challenged action. (Dkt. # 42, Pg. ID 507.) Classifying Juggalos as a "hybrid gang," Plaintiffs argue, causes Plaintiffs to "face unfavorable treatment in employment and business relationships, divorce and custody disputes, and law enforcement and prosecutorial activities. (*Id.*)

But the decision to describe Juggalos as a "hybrid gang" for the NGTA does not "mark the culmination of the decision making process," the publication of the NGTA does. *Hawkes, Co.*, 136 S.Ct. at 1813. In any event, Plaintiffs have not alleged any unfavorable treatment in divorce or custody disputes, and the other alleged consequences remain the result of independent responses and choices of third parties, not of the classification. Plaintiffs' distinction is therefore immaterial.

Regardless of whether the challenged action is the decision to classify or the publication of the classification, Plaintiffs fail to allege legal consequences within the meaning of *Hawks, Co. Id.* In the absence of legal consequences, Plaintiffs' claims are not reviewable under APA, and the court will therefore grant Defendants' Motion with respect to Plaintiffs' APA claims.

### B. Committed To Agency Discretion

Even assuming that the classification is a final agency action, that action is committed to agency discretion by law and not subject to APA review. *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1127 (6th Cir. 1996) (citing *Lincoln v. Virgil*, 508 U.S. 182 (1993)). Section 701 provides for judicial review of agency actions except "to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency

discretion by law." *Id.* (citing 5 U.S.C. § 701). An agency action is "committed to agency discretion by law" if "the statute does not provide a meaningful standard against which to judge the agency's exercise of discretion." *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). If such a situation exists, the court "must decline to exercise jurisdiction over the matter." *Id.*

The statute provides only that the Attorney General shall establish the NGIC "to collect, analyze, and disseminate gang activity information" from a variety of sources, and the NGIC "shall make available the [gang activity] information" to all levels of law enforcement, corrections, and prosecutorial agencies and "shall annually submit to Congress a report on gang activity." Pub. L. No. 109-162, Title XI, § 1107. The statute defines neither "gang activity" nor "gang." Nor does it mandate standards for collecting information, exclude groups based on size or type, demand maintenance of a database of groups classified as gangs, or require a process for identified groups to challenge their inclusion in a report, however absurd their inclusion may appear. *See id.*

The court is left with no standard against which to compare the reasoning or procedure behind the agency's decision to include Juggalos in the report and, therefore, the action must be committed to agency discretion by law. *Madison-Hughes*, 80 F.3d at 1127. While the mere "fact that an agency's decision is committed to its discretion by law does not, ipso facto, preclude review of constitutional claims," *Burdue v. F.A.A.,* 774 F.3d 1076, 1082 (6th Cir. 2014), only Counts 1, 2, and 3 are constitutional claims. As a result, at least Counts 4 and 5 must be dismissed on this alternative ground as well.

### C. Vagueness

Plaintiffs also do not allege a plausible vagueness claim. Plaintiffs are correct that "Due Process requires lawmakers to avoid vagueness and instead provide fair notice about what the law requires." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). But neither the report nor the decision to classify Juggalos as a "hybrid gang" *require* anything, and Plaintiffs do not allege anything to the contrary. Plaintiffs' cited cases are inapposite – all deal with criminal offenses or civil law regulations. (Dkt. # 42, Pg. ID 520.) Plaintiffs provide no authority to support their proposition that an agency action with no regulatory aim or actual, direct effect can be subject to vagueness challenges. Because neither the inclusion of Juggalos in the NGTA nor its publication "require" anything, the actions cannot be unconstitutionally vague "about what the law requires." *Fox Television*, 132 S. Ct. at 2317. Count 3 fails to state a claim for this alternative reason as well.

### D. Declaratory Relief

Having concluded that dismissal is appropriate for Counts 1-5, the court can also dispense with Plaintiffs' claim under the DJA. In their response, Plaintiffs concede that the DJA does not create an independent cause of action. (Dkt. # 42, Pg. ID 524 n.9.) Thus the court will grant Defendants' Motion with respect to Count 6 as well.

16

## IV. CONCLUSION

IT IS ORDERED that Defendants' Motion to Dismiss (Dkt. # 37) is GRANTED.

                                       s/Robert H. Cleland  
                                       ROBERT H. CLELAND  
                                       UNITED STATES DISTRICT JUDGE

Dated: September 29, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 29, 2016, by electronic and/or ordinary mail.

                                       s/Lisa Wagner  
                                       Case Manager and Deputy Clerk  
                                       (313) 234-5522